# In the United States Court of Appeals for the Fifth Circuit

TEXAS ENTERTAINMENT ASSOCIATION, INCORPORATED; LONE STARR MULTI-THEATERS, LIMITED, DOING BUSINESS AS NEW FINE ARTS WEST; XTC CABARET, INCORPORATED, DOING BUSINESS AS XTC CABARET AUSTIN; RCI DINING SERVICES (ROUND ROCK), INCORPORATED, DOING BUSINESS AS RICK'S CABARET,

*Plaintiffs-Appellants*,

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS; ED SERNA, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE TEXAS WORKFORCE COMMISSION,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF FOR APPELLEES

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

BENJAMIN WALLACE MENDELSON
Assistant Solicitor General
Ben.Mendelson@oag.texas.gov

Counsel for Appellees

# Certificate of Interested Persons

No. 24-50434

Texas Entertainment Association, Incorporated; Lone Starr Multi-Theaters, Limited, doing business as New Fine Arts West; XTC Cabaret, Incorporated, doing business as XTC Cabaret, Austin; RCI Dining Services (Round Rock), Incorporated, doing business as Rick's Cabaret,

*Plaintiffs-Appellants,*

*v.*

Ken Paxton, Attorney General, State of Texas; Ed Serna, in his official capacity as Executive Director of the Texas Workforce Commission,

*Defendants-Appellees.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellees, as governmental parties, need not furnish a certificate of interested persons.

/s/ Benjamin Wallace Mendelson
Benjamin Wallace Mendelson
*Counsel of Record for*
*Defendants-Appellees*

i

## Statement Regarding Oral Argument

Appellees do not believe that oral argument is necessary to resolve this case. Nonetheless, if the Court finds that oral argument will be helpful, Appellees request to participate.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ........................................................... i

Statement Regarding Oral Argument ..................................................... ii

Table of Authorities ............................................................................ v

Introduction ....................................................................................... 1

Statement of Jurisdiction .................................................................... 2

Issues Presented .................................................................................. 2

Statement of the Case ......................................................................... 2

    I.   The Texas Legislature Enacts S.B. 315. ...................................... 2

    II.  The Evidence Presented to the Legislature ................................. 4

        A.  Stories from the adult entertainment industry ...................... 4

            1.   Stories of survivors .......................................................... 4

            2.   Stories of prosecutors, investigators, and witnesses ...................... 6

        B.  Studies of the industry ........................................................ 10

        C.  The biology behind the bill .................................................. 14

    III. Procedural History ................................................................. 15

        A.  Pretrial evidence ................................................................ 16

            1.   New Fine Arts ................................................................ 16

            2.   The Texas Entertainment Association ......................... 18

            3.   XTC and Rick's ............................................................ 18

            4.   Amada Man .................................................................... 19

        B.  The testimony at trial .......................................................... 19

            1.   Dr. Vanessa Bouche ....................................................... 19

            2.   Cara Pierce .................................................................... 21

            3.   Angelina Spencer-Crisp ................................................ 23

        C.  The district court's opinion ................................................ 23

Summary of the Argument ................................................................. 24

Standard of Review ........................................................................... 25

Argument ......................................................................................... 25

    I.   S.B. 315 Does Not Violate the First Amendment. ..................... 25

A. S.B. 315 is subject at most to intermediate scrutiny. ........................... 25

B. S.B. 315 passes intermediate scrutiny ................................................ 26

    1. S.B. 315 furthers substantial government interests in preventing human trafficking, sexual abuse, and other crimes. ............................................................................................ 27

        a. Dancers at strip clubs ........................................................ 28

            i. Strip Clubs facilitate human trafficking of dancers. ........................................................................... 29

            ii. The age of entry into commercial sexual exploitation is approximately 18-20. ........................... 30

            iii. Crime beyond human trafficking is rampant in strip clubs. ....................................................................31

            iv. Minors impermissibly work as dancers in strip clubs. ...........................................................................31

            v. Teenagers have poorer judgment than older adults. ......................................................................... 32

            vi. Putting the pieces together ........................................... 33

        b. Other employees of strip clubs ............................................ 33

        c. Employees at other SOBs ..................................................... 34

    2. Plaintiffs' arguments are meritless. .......................................... 36

    3. S.B. 315 permits reasonable alternative avenues of communication ..................................................................................... 40

        a. The age of dancers and other employees does not alter the *businesses'* speech. .......................................... 41

        b. S.B. 315 permits reasonable avenues of communication for *employees* of SOBs. ................................. 42

    4. Plaintiffs' arguments as to *Renton*'s second prong fail. ............... 45

        a. Plaintiffs apply the wrong standards. .................................... 45

        b. Plaintiffs incorrectly view the facts. ..................................... 48

II. S.B. 315 is Not Overbroad. ......................................................................... 49

Conclusion ...........................................................................................................51

Certificate of Service ......................................................................................... 52

Certificate of Compliance ................................................................................. 52

# Table of Authorities

Page(s)

**Cases:**

*A&A Concepts, L.L.C. v. Fernandez,*
107 F.4th 478 (5th Cir. 2024) .................................................. 25

*Ashcroft v. Free Speech Coalition,*
535 U.S. 234 (2002) ............................................................. 46

*Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas,*
83 F.4th 958 (5th Cir. 2023) ...................................... *passim*

*Bevill v. Fletcher,*
26 F.4th 270 (5th Cir. 2022) ................................................. 43

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010) ............................................................. 45

*City of L.A. v. Alameda Books, Inc.,*
535 U.S. 425 (2002) ........................................................ 25, 35

*City of Renton v. Playtime Theatres, Inc.,*
475 U.S. 41 (1986) .................................................... *passim*

*Deloach Marine Servs, L.L.C., v. Marquette Transp. Co., L.L.C.,*
974 F.3d 601 (5th Cir. 2020) ................................................. 25

*Doe I v. Landry,*
909 F.3d 99 (5th Cir. 2018) ......................................... *passim*

*Fantasy Ranch Inc v. City of Arlington,*
459 F.3d 546 (5th Cir. 2006) .................................... 26, 37, 48

*Hang On, Inc. v. City of Arlington,*
65 F.3d 1248 (5th Cir. 1995) ................................................ 43

*Illusions—Dallas Private Club, Inc. v. Steen,*
482 F.3d 299 (5th Cir. 2007) ................................................ 47

*J&B Ent., Inc. v. City of Jackson,*
152 F.3d 362 (5th Cir. 1998) ................................................ 45

*McConnell v. Fed. Election Comm'n,*
540 U.S. 93 (2003) .............................................................. 45

*McCullen v. Coakley,*
573 U.S. 464 (2014) ............................................................. 46

*Rollins v. Home Depot USA*,
  8 F.4th 393 (5th Cir. 2021) ............................................... 36

*Turner v. Lieutenant Driver*,
  848 F.3d 678 (5th Cir. 2017) ............................................ 45

*United States v. Hansen*,
  599 U.S. 762 (2023) ....................................................... 49

*United States v. Keys*,
  No. 3:16-cr-00244-N (N.D. Tex.) ..................................... 17

*United States v. Mitchell*,
  732 F. App'x 298 (5th Cir. 2018) .................................... 19

*United States v. O'Brien*,
  391 U.S. 367 (1968) ............................................... *passim*

*United States v. Rodriguez*,
  No. 4:17-cr-00724-1 (S.D. Tex. May 17, 2021) .................. 19

*Voting for Am., Inc. v. Steen*,
  732 F.3d 382 (5th Cir. 2013) ........................................... 42

**Constitutional Provisions, Statutes and Rules:**

U.S. Const. amend. I ............................................... *passim*

28 U.S.C.:
  § 1291 ........................................................................ 2
  § 1331 ........................................................................ 2

42 U.S.C. § 1983 ............................................................ 2

Fed R. App. P. 4(a)(1)(A) ............................................... 2

Fed R. Civ. P. 65(a)(2) .................................................. 19

Tex. Civ. Prac. & Rem. Code:
  § 125.002(a) .............................................................. 3
  § 125.0015(a)(19) .............................................. 2-3, 44
  § 125.0015(a)(22) ...................................................... 4

Tex. Labor Code:
  § 51.016(i)(3) ............................................................ 3
  § 51.016(a)(2) ........................................................... 3
  § 51.016(b) ........................................................... 3, 44
  § 51.031(b) ............................................................... 3
  § 51.039 .................................................................... 3

Tex. Loc. Gov't Code § 243.002 ....................................... 3

Tex. Penal Code:

§ 43.251 ........................................................................................ 4
§ 43.251(a)(1) ............................................................................... 3
§ 43.251(a)(5) ............................................................................... 4
§ 43.251(b) .................................................................................. 44
§ 43.251(b)(1)-(2) .................................................................. 3, 44
§ 43.251(c) .................................................................................... 4
§ 43.251(5) .................................................................................. 44

## Other Authorities:

https://legiscan.com/TX/text/SB315/2021 ............................................ 2

Licensing & Administrative Procedures S/C Business & Occupational
   Regulation – Apr. 9, 2021, *available at*
   https://house.texas.gov/videos/6074 ...................................................7, 12

Senate Committee on Jurisprudence (Part I) - Apr. 22nd, 2021, *available at*
   https://senate.texas.gov/videoplayer.php?vid=16169&lang=en ......................... 4

# Introduction

Texas officials diligently work to combat the evils of human trafficking in the State. Based on law-enforcement experience, they recommended to the Texas Legislature that raising the age of employment at sexually oriented businesses ("SOBs") from eighteen to twenty-one would help to prevent young people from becoming the unfortunate victims of human trafficking. Sometimes, the live nudity featured onstage at SOBs like strip clubs makes them a recruiting ground for traffickers to find their next victims. Other times, businesses such as adult book or video stores feature private rooms where trafficking or prostitution occurs. After receiving thousands of pages of evidence, the Legislature determined that raising the age of employment at SOBs from eighteen to twenty-one would help to combat these problems and passed Senate Bill 315 to impose that requirement.

The Plaintiffs believe that this age restriction on employment violates the First Amendment. But they are wrong. Under this Court's secondary effects test, the Defendants have easily satisfied their burden. The record contains hundreds of pages of evidence that Plaintiffs completely ignore explaining why raising the age of employment at SOBs is reasonably relevant to furthering the State's interests in preventing not just sex trafficking, but prostitution, underage drinking, sexual abuse, and other crimes. And raising the age of employment leaves open reasonable alternative avenues of communication for SOBs, which is all the Court requires.

## Statement of Jurisdiction

Plaintiffs invoked the district court's jurisdiction because their claims arise under the First Amendment and 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331; ROA.474. This Court has appellate jurisdiction over the district court's final judgment following trial because it is a final decision that disposes of all claims. *See* ROA.11410-11; 28 U.S.C. § 1291. The district court entered final judgment on April 30, 2024, ROA.11411, and Plaintiffs timely appealed on May 28, 2024, ROA.11412; *see* Fed R. App. P. 4(a)(1)(A).

## Issues Presented

1. Whether S.B. 315 passes the First Amendment's secondary effects test in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), and its progeny.

2. Whether S.B. 315 is overbroad within the meaning of the First Amendment.

## Statement of the Case

### I. The Texas Legislature Enacts S.B. 315.

In 2021, the Texas Legislature passed Senate Bill 315, which effectively raised the age of employment at SOBs from eighteen to twenty-one. Relevant here, S.B. 315 changed Texas law in three ways. [1]

First, S.B. 315 provides that a person maintains a "common nuisance" by "employing or entering into a contract for the performance of work or the provision of a service with an individual younger than 21 years of age for work or services performed at a sexually oriented business." Tex. Civ. Prac. & Rem. Code

---

[1] S.B. 315 may be found here: https://legiscan.com/TX/text/SB315/2021.

§ 125.0015(a)(19). That provision defines "sexually oriented business" to include an "adult bookstore, adult movie theater, adult video arcade, adult movie arcade, adult video store, adult motel, or other commercial enterprise the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer." Tex. Loc. Gov't Code § 243.002; *see* Tex. Civ. Prac. & Rem. Code § 125.0015(a)(19). The Attorney General is authorized to bring suits to enjoin and abate common nuisances. Tex. Civ. Prac. & Rem. Code § 125.002(a).

Second, S.B. 315 amended the Texas Labor Code such that, generally, "[a] sexually oriented business may not employ or enter into a contract . . . for the performance of work or the provision of a service with an individual younger than 21 years of age." Tex. Labor Code § 51.016(b). This Labor Code provision incorporates the same definition of sexually oriented business stated above. *Id*. § 51.016(a)(2); Tex. Loc. Gov't Code § 243.002. The Attorney General may also seek injunctive relief against an employer "who repeatedly violates the requirements" of Chapter 51 of the Labor Code "relating to the employment of children." *Id.* § 51.039. A violation of § 51.016(b) is also a class A misdemeanor. *Id*. §§ 51.016(i)(3), 51.031(b).

Third, S.B. 315 changed the definition of "child" from 18 to 21 in the portion of the Texas Penal Code that criminalizes "employment harmful to children." Tex. Penal Code § 43.251(a)(1). Under that provision, "[a] person commits an offense if the person employs, authorizes, or induces a child to work: (1) in a sexually oriented commercial activity; or (2) in any place of business permitting, requesting, or requiring a child to work nude or topless." *Id*. § 43.251(b)(1)-(2). "Sexually oriented

commercial activity" means "a massage establishment, nude studio, modeling studio, love parlor, or other similar commercial enterprise the primary business of which is the offering of a service that is intended to provide sexual stimulation or sexual gratification to the customer." *Id.* § 43.251(a)(5). A violation of this section is a felony. *Id.* § 43.251(c); *see also* Tex. Civ. Prac. & Rem. Code § 125.0015(a)(22) (making employment harmful to a child as described by Section 43.251 of the Penal Code a common nuisance). Together, these provisions prohibit the employment of persons under age twenty-one at SOBs in Texas.

## II. The Evidence Presented to the Legislature

Before passing S.B. 315, the Legislature heard the live testimony of many individuals and received thousands of pages of documentary evidence. ROA.6411-14 (index of documents presented to Legislature). This brief summarizes only a portion of that evidence.

### A. Stories from the adult entertainment industry

#### 1. Stories of survivors

The Senate Committee on Jurisprudence heard testimony on S.B. 315. Senate Committee on Jurisprudence (Part I) – Apr. 22nd, 2021, *available at* https://senate.texas.gov/videoplayer.php?vid=16169&lang=en.[2] Jessica Wesley testified about her own experience working in strip clubs. She explained that at age eighteen, another dancer recruited her to work at a strip club. To be "approve[d]" for the job,

---

[2] The videos of legislative testimony discussed in this brief were presented to the district court. ROA.11306-10.

the club manager made her take off her clothes in front of him. *Id.* at 56:15-48. To keep her relaxed at work, the club gave her plenty of free alcohol. *Id.* at 57:05-12. Wesley also recruited other eighteen-year-old women to work with her. *Id.* at 57:10-15. They were never denied alcohol at the club, even though the managers knew their age. *Id.* at 57:10-25. She explained that "money talks" in this industry, and club managers commonly looked the other way in the face of underage drinking and illegal drug use. *Id.* at 57:25-34. During her years as a dancer, she testified that she was either drunk or on cocaine almost all of the time. *Id.* at 57:40-46. Unfortunately, she was also the victim of numerous sexual assaults. *Id.* at 58:02-15.

Nisi Hamilton, a survivor of sexual abuse and human trafficking, also testified. *Id.* at 59:50. She was sold for sex at age fourteen. *Id.* at 1:00:13. By age sixteen, she was working at strip clubs. *Id.* at 1:02:08-12. Her "pimp" had established relationships with strip club owners across Houston such that she could work in them despite her age. *Id.* at 1:02:12-24. Though she was underage, the club gave her alcohol every night to "loosen up and play nice" with the customers. *Id.* at 1:02:25-33. She knew of many other teenage girls, ages fifteen, sixteen, seventeen, and eighteen, who were "passed around from club to club." *Id.* at 1:02:53-1:03:02. The strip clubs gave her makeup to wear so she could pass for eighteen. *Id.* 1:03:21-25 She "could always pass for an eighteen-year-old," but she did not look twenty-one. *Id.* 1:03:25-36.

The Legislature also received the declaration of Ashley Carnes, originally filed in *Doe I v. Landry*, 909 F.3d 99 (5th Cir. 2018). ROA.8964. Carnes began working at a strip club at sixteen. ROA.8964. At a strip club in Dallas, a pimp recruited her into forced prostitution. ROA.8965. Carnes believes that most strip club dancers also

engage in prostitution. ROA.8965. At a strip club in New Orleans where she worked, the club gave the dancers condoms to use in the VIP rooms because "the VIP rooms were meant for sex, not private lap dances." ROA.8965. "It was not a secret." ROA.8965. Most of the dancers used drugs at that club too. ROA.8965. Carnes knew dancers "who became addicted to drugs, were kidnapped by pimps, and even killed." ROA.8966.

### 2. Stories of prosecutors, investigators, and witnesses

Cara Pierce, then-Chief of the Texas Attorney General's Human Trafficking and Organized Crime Unit and a former federal prosecutor also testified. Senate Committee on Jurisprudence, *supra* 4. In her time as a federal prosecutor, "almost all" of the *adult* trafficking victims she encountered were under the age of twenty-one. *Id.* at 44:25-55. She explained that pimps recruited many of these victims either by finding them at SOBs or by requiring them to work at SOBs to earn money or meet customers with whom they would later engage in commercial sex. *Id.* at 44:57-45:20. She explained that raising the age of employment to twenty-one will help law enforcement officers prevent children from being trafficked through strip clubs. That is so because law enforcement officers often monitor the entrances to strip clubs, and it is easier for them to differentiate between a fifteen-year-old and a twenty-one-year-old than a fifteen-year-old and an eighteen-year-old. *Id.* at 45:54-46:20. Raising the age to twenty-one also helps law-abiding SOB owners by making it easier for them to spot a fake identification document presented by a teenage girl and not hire her. Such a prospective employee may appear to be eighteen but may not pass as twenty-one. *Id.* at 46:24-40.

A House committee also heard testimony on H.B. 3520, S.B. 315's companion bill. Licensing & Administrative Procedures S/C Business & Occupational Regulation – Apr. 9, 2021, *available at* https://house.texas.gov/videos/6074. Lisa Michelle, the founder of a nonprofit organization in San Antonio that provides care to those who work in SOBs, testified. *Id.* at 6:45-7:45. She once encountered twenty-two children, ages 13-17, who were victims of human trafficking, and each had worked at an SOB. *Id.* at 7:45-8:02. She explained that it would be harder for young women like these to pass for age twenty-one than eighteen. *Id.* at 9:20-35.

The Legislature also received affidavits from investigators who visited adult video and bookstores. One affidavit described a visit to a store called "Pleasures Video" in Tampa, Florida, which contained "sixteen peepshow booths" covered in semen stains. ROA.6508. A similar affidavit describes a visit to a business in Florida called "Adult Book Store 1" which contained "four theaters" also covered in semen stains. ROA.6511. Affidavits from other adult book and video stores describe similar findings. ROA.6512-13. Many of these adult book and video stores feature private "peepshow booths." *See, e.g.,* ROA.6515.

A report about an adult video store explained that investigators were quoted prices for live nude shows. ROA.6518. The same establishment contained 45 "peepshow booths." ROA.6518. The booths contained holes in the walls, including holes "located approximately waist high to about mid-thigh." ROA.6519. At this same venue, an employee informed investigators that one of the theaters was "reserved on weekends for male/female couples only." ROA.6519. Another report described an investigator inquiring if "any girls were working." ROA.6523. There were, and

an employee explained that one was a "new younger girl" who "needed to be broken in." ROA.6523.

An investigator described his visit to a strip club in El Paso. ROA.6528. There, a dancer told him that for thirty dollars he could receive an "exclusive VIP dance" in a "private room." ROA.6528. An investigator visited another strip club in El Paso where he and an exotic dancer went to "the darkest place in the VIP section." ROA.6529. The dancer was fully nude and agreed to engage in commercial sex for a fee. ROA.6529. Investigators reported that sometimes dancers offered commercial sex. ROA.6534.

At a public hearing in Georgia regarding a proposed adult entertainment ordinance, ROA.6644-54, a juvenile court judge explained that children had testified in her court that they had "gotten fake IDs and been allowed to dance in these establishments, as well as to work in them." ROA.6648-49. Per her affidavit, "some of the juvenile girls . . . testified that they danced at adult entertainment clubs, some have worked other jobs in adult entertainment clubs, and some have performed sexual acts in parking lots of adult entertainment clubs." ROA.6852.

The Texas Legislature also received former strip club manager David Sherman's written testimony that he originally gave to a committee of the Michigan Legislature. ROA.8174. Sherman worked in the adult entertainment industry for fourteen years. ROA.8175. Based on his experiences, he explained that young women are usually "extremely" against exotic dancing initially, "and most of the time are hired as waitresses, even though waitresses are not needed." ROA.8175. While working as a waitress, they become desensitized to the strip club atmosphere. ROA.8175. So

eventually, they see stripping as a job "and are converted quite easily to dancing." ROA.8175. To that end, Sherman told the stories of three young women who started working at strip clubs as waitresses, were soon converted to dancing, and began using drugs and alcohol. ROA.8176-77.

Sherman also explained that all female employees in adult entertainment night-clubs are "treated as a potential dancer. It really doesn't matter if she's hired as a waitress, hostess, or even a bartender." ROA.8177. Sherman explained the manipulative process that club managers use to convert these types of employees into dancers. ROA.8177. Managers will ensure that the new waitress, hostess, or bartender is treated as a long-lost friend by other employees. ROA.8177. Then, after some time has passed, a manager will mention to her that the club is short-staffed on dancers for a given night and will ask the female employee to help. ROA.8177. The manager will explain that she doesn't need to take her clothes off and will offer a skimpy dress instead. ROA.8177. At that point, these new dancers "having become used to the environment and having seen nudity daily," become "intoxicated with the sense of being on stage and are lured out of their clothing by the other girls, customers, and promises of large tips." ROA.8177.

If that trick fails, managers can make their female employees feel guilty about not wanting to help the club. ROA.8178. Or managers can make their waitresses feel needed. ROA.8178. Managers can also tell young women that they are no longer needed in their current position, but dancing positions are open if they want to remain employed. ROA.8178.

In any event, when these employees become dancers, they soon "realize how much easier this job is being drunk, high, or more often than not, both." ROA.8178. Unfortunately, as Sherman testified, drug dealers frequent strip clubs. ROA.8180. They go there "merely for business, selling, giving, and using the girls in [their] drug trade." ROA.8180. Many young women owe these drug dealers money, which can lead to terrible consequences. ROA.8180.

## B. Studies of the industry

The Legislature also received study after study involving the adult entertainment industry, including studies of Texas cities. A study from Austin examined "mostly bookstores, theaters, massage parlors, and topless bars." ROA.6926. Sexually related crime in areas with SOBs ranged from 177-482% higher than the city average. ROA.6926. A study of El Paso concluded that "there is a significant increase in crime near SOBs" and that the average crime rate in areas with SOBs was "72% higher than the rate in the control areas." ROA.6930. Sex-related crimes also "occurred more frequently in neighborhoods with even one SOB." ROA.6930.

A Houston study noted that at SOBs, holes cut "between enclosed booths promote anonymous sex and facilitate the spread of disease," and "[t]he lack of a clear line of vision between manager's stations and booths or secluded areas (VIP rooms) encourages lewd behavior and sexual contact." ROA.6932. The Houston study also mentioned that "[l]ocked rooms within SOBs are usually fronts for prostitution." ROA.6933. The Houston Police Department's Vice Division reported that in an approximately one-year period between 1995 and 1996, it arrested 517 people at SOBs and 355 were convicted. ROA.6947. Of those, 289 were dancers in topless clubs, and

59% were convicted. ROA.6947. Thirty-six customers of adult video stores were arrested and 86% were convicted. ROA.6947. 149 customers of adult bookstores were arrested with 125 convictions. ROA.6947. At topless clubs, the crimes involved included "prostitution, public lewdness, narcotics, and indecent exposure." ROA.6947. Undercover police officers in Houston reported that strip club employees will often ask customers to "move to a more secluded area, or possibly the VIP room of the club," where "sexual or lewd activities occur." ROA.6947. Officers also explained that adult bookstores "are nothing more than just blatant open sexual contact between people with complete anonymity." ROA.6948. One officer stated that "in his eleven years with Vice he does not recall ever seeing anyone go into a booth, watch the movie for thirty minutes and walk out." ROA.6948. Houston police officers recommended raising the age of employment at SOBs to twenty-one. ROA.6948.

A study by Professor Richard McCleary of the University of California, Irvine, who has advised state and local governments about the problems of SOBs for 30 years, ROA.7101, 7104, explained that the model of adult video stores that combines the sale of adult DVDs with private viewing booths "continues to flourish" and remains common. ROA.7130. And private "viewing booths create opportunities for sexual contact." ROA.7130.

Another study by Kelly Holsopple, the Program Director of the Freedom and Justice Center for Prostitution Resources and a former exotic dancer, ROA.8157, contains many important findings:

- The mean age of entry into stripping is eighteen years and ten months. ROA.8158-59.

- An eighteen-year-old woman entered a strip club, and the owner told her that she could make money by stripping and pressured her to enter an "amateur contest" that night. She won the contest and began stripping at that club for three weeks "before being recruited into an escort service by a patron pimp." ROA.8159.

- Most strippers are hired as independent contractors rather than employees. They are not paid wages, so their income is "totally dependent on their compliance with customer demands in order to earn tips." ROA.8159.

- "Despite claims from management that customers are prohibited from touching the women, this rule is consistently violated." ROA.8161.

- Stripping "usually involves prostitution." ROA.8161.

- "Private dances are situations where women are often forced into acts of prostitution in order to earn tips." ROA.8162.

- "Pimps season women first with stripping and then turn them out into brothels or escort services for more money." ROA.8168. Pimps and drug dealers in strip clubs "seek to engage women in prostitution." ROA.8168

- "Owners, managers, and staff pressure the women to perform sexual acts on them." ROA.8168.

Joe Madison, the executive director of an organization that addresses the problem of illicit commercial sex in Houston, also testified. Licensing & Administrative Procedures subcommittee, *supra*, at 10:45-11:02. He explained that sex "buyers" prefer targeting younger performers in strip clubs because they believe that younger

performers are less likely to carry sexually transmitted diseases. *Id.* at 12:31-12:40. Regardless of the reason, "young people are targeted by buyers in strip clubs." *Id.* at 12:40-12:42. He also cited a study noting that 100% of exotic dancers surveyed had suffered physical and sexual abuse during "work-related activities." *Id.* at 12:50-13:01.

George P. Bush, then-Texas Land Commissioner, provided live testimony before the Legislature in his individual capacity. He cited studies showing that 70% of human trafficking victims are women trafficked in the commercial sex industry, which includes the porn industry, strip clubs, and brothels. Senate Committee on Jurisprudence, *supra*, at 49:00-49:14. He also cited a study showing that 65% of women who work in strip clubs have been victims of sexual exploitation. *Id.* at 49:30-49:35.

A study published in the Journal of Urban Health from the New York Academy of Medicine surveyed women ages eighteen or older who had danced at strip clubs. ROA.6453. Fifty-seven percent reported using drugs, sixty-one percent had engaged in transactional sex, and sixty-seven percent of those did so for the first time after beginning to dance. ROA.6453. Forty-three percent reported selling sex in a strip club within the past three months. ROA.6453.

A study examined whether the presence of SOBs related to increased levels of crime. ROA.6463. It concluded that "sexually oriented businesses are associated with much higher rates of all types of offenses in the immediate vicinity of the business and continue to have significant effects on crime levels as one moves further from the business." ROA.6464. The study examined thirty SOBs, including 21 strip

clubs and 9 "adult book/toy stores with all but 2 having private video viewing booths or an adult theater." ROA.6471. The study "presents evidence that the presence of SOBs is clearly related to crime in urban communities." ROA.6476. Specifically, within 500 feet of an SOB, "no other variable is more influential on crime rates than the presence of the SOB." ROA.6476.

### C.  The biology behind the bill.

The Legislature also received the sworn declaration of Rafael Salcedo, Ph.D., originally filed in *Doe*. ROA.8982. Dr. Salcedo is a clinical neuropsychologist who explained that "brain development in adolescents is not complete until they reach their early to mid-20's." ROA.8982. That is so because "the prefrontal cortex, an area of the brain responsible for . . . judgment, behavioral inhibition, motivation, and regulation of emotion is one of the latest neurobiological developments in the process of maturation." ROA.8982. Accordingly, "the judgment, capacity to anticipate consequences, long term planning ability, and other higher level cognitive activities can be equally underdeveloped in individuals age 18, 19, and 20 in particular." ROA.8983. Dr. Loretta Sonnier provided similar information, ROA.8987, and discussed "biological reasons that young adults are more vulnerable to making poor decisions and putting themselves in dangerous situations." ROA.8989.

Against this backdrop of sobering stories and scientific studies, the Legislature passed S.B. 315.

## III. Procedural History

The Plaintiffs consist of the trade association for the adult entertainment industry in Texas, two strip clubs, and one adult book and video store, all located in Texas. ROA.464, 11391. Specifically, the Texas Entertainment Association is a trade association for the adult entertainment industry whose members include strip clubs and adult bookstores, ROA.464, 11391. Lone-Starr Multi-Theatres, d/b/a New Fine Arts West, is an adult bookstore and video arcade. ROA.464, 11391. RCI Dining Services d/b/a Rick's Cabaret and XTC Cabaret are both strip clubs owned by the same parent company. ROA.464, 11391.[3] These businesses are all members of the TEA. ROA.464-65. They sued Texas Attorney General Ken Paxton and Executive Director of the Texas Workforce Commission Ed Serna, both in their official capacities. ROA.465. Plaintiffs alleged that S.B. 315 violates their First Amendment rights to expression and that the statute is unconstitutionally overbroad. ROA.474-75, 477. They sought declaratory and injunctive relief. ROA.481-82.

Plaintiffs moved for a preliminary injunction, which the district court denied. ROA.349. The district court explained that intermediate scrutiny applied to S.B. 315, and applied the test in *United States v. O'Brien*, 391 U.S. 367 (1968). ROA.357. It held that the statute likely passed intermediate scrutiny, and "even Plaintiffs' witnesses testified that trafficking occurs at certain SOBs with alarming frequency."

---

[3] This case initially included several individual plaintiffs under age 21 who sought employment at SOBs but had all turned twenty-one by the time of trial. ROA.11388 n.1. Accordingly, the district court dismissed these plaintiffs at trial because their claims were moot. ROA.11388 n.1.

ROA.359. The district court also held that Plaintiffs were unlikely to succeed on their overbreadth claim. ROA.361.

After discovery, both parties moved for summary judgment. The district court held that intermediate and not strict scrutiny applied to S.B. 315 but denied both motions. ROA.10333-41, 10372-75.

The case was tried to the district court. *See* ROA.11388. The parties agreed to admit the vast majority of exhibits used at the preliminary injunction hearing and at summary judgment. ROA.11391, 11871. Those exhibits included the deposition excerpts of the Plaintiffs' corporate representatives, about which the district court made findings. ROA.11395-97. The relevant testimony is discussed below.

## A. Pretrial evidence

### 1. New Fine Arts

Gary Hartstein provided deposition testimony as a corporate representative for plaintiff New Fine Arts. ROA.9824. Despite being called an adult bookstore, New Fine Arts mostly sells sex toys, and Hartstein described the store as "more of a supermarket of sex items, but not so much pornography." ROA.9832. New Fine Arts also has an "adult arcade" which is a "private room where people can go and watch a movie privately." ROA.9833-34. Nonetheless, two people are allowed in the rooms at once, and the rooms lock from the inside. ROA.9835. When asked why the rooms lock from the inside, Hartstein stated "I don't want to know what's going—what's going on behind closed doors. I don't—it's not my business." ROA.9835. He later said, "They're paying for the room, and whatever they want to do, it's their

business." ROA.9835. Hartstein tacitly admitted that if individuals had sex in the private rooms, New Fine Arts would not stop them. ROA.9836.

In these rooms, there is a couch, table, and trash can. ROA.9837. Hartstein admitted that he had taken no steps regarding human trafficking in his stores, ROA.9843, or to learn whether money changes hands in the private rooms. ROA.9845.

New Fine Art's deliberate indifference to the activities in its private rooms has yielded terrible consequences. A criminal named Martavious Keys trafficked a teen-age girl at a New Fine Arts location in Dallas. ROA.9865, 11396 n.3.[4] Keys "hit up customers inside the store, and then [the victim] had sex inside the store in their pornographic viewing rooms with customers at New Fine Arts in Dallas." ROA.9865. Keys knew someone who worked at New Fine Arts, "paid somebody" and "that's why he was allowed to have [the victim] work there." ROA.9866. Keys was sentenced to life in prison. ROA.9862-63; *see United States v. Keys*, No. 3:16-cr-00244-N (N.D. Tex.), *aff'd* 747 F. App'x 198, 203 (5th Cir. 2018). Hartstein testified that he "didn't know about it. There could be others. I don't know." ROA.9875.

---

[4] Plaintiffs misleadingly state that this crime did not occur at "Plaintiff New Fine Arts West." Appellant.Br.21. The actual Plaintiff in this case is Lone Starr Multi-Theatres, a parent company that owns both New Fine Arts West, located on West Northwest Highway in Dallas, and New Fine Arts on Mockingbird Lane, ROA.9825-27, the latter of which facilitated Keys's crime, ROA.9866.

### 2. The Texas Entertainment Association

Kevin Richardson provided deposition testimony as TEA's corporate representative. ROA.9878; *see* ROA.11395 (findings of fact). Richardson owns several strip clubs that are members of the TEA. ROA.9882-83. TEA is a trade association, and most of its members are strip clubs. ROA.9884, 9890. TEA does not require its members to follow state and local laws regulating SOBs. ROA.9891-93. If sex trafficking occurs at one of TEA's members, there are no membership repercussions. ROA.9903.

Richardson recalled hearing Cara Pierce testify at the preliminary injunction hearing in this case that she had prosecuted multiple sex trafficking cases involving a group of strip clubs called Bucks, and Richardson owns several Buck clubs. ROA.9904. When Richardson learned that information, he asked his business partner and others about it, and none knew about it. ROA.9905. Richardson was also presented with the story of an 18- or 19-year-old woman who worked as a dancer at a Bucks strip club in Fort Worth. ROA.9916-17. She met pimps at the strip club, and "they ended up getting her out of the strip club and also caus[ed] her to engage in commercial sex acts at hotels." ROA.9917.

### 3. XTC and Rick's

XTC and Rick's are strip clubs owned by the same parent company, RCI Hospitality Holdings. ROA.9940-41, 11260. RCI has decided to purchase at least two strip clubs that have facilitated human trafficking. In December 2022, RCI announced the purchase of a strip club called Chicas Locas in Houston. ROA.9973. In April 2021, a criminal named Jesus Rodriguez was sentenced to fifteen years in

prison for leading a sex trafficking ring involving that very club. ROA.9978; *see* Amended Judgment in a Criminal Case, *United States v. Rodriguez*, No. 4:17-cr-00724-1 (S.D. Tex. May 17, 2021), ECF 208. As part of his crimes, Rodriguez forced women to pay him by working at the very same Houston Chicas Locas location that RCI purchased. ROA.9978; *see also* ROA.9975-76.

RCI has also purchased another strip club called Baby Dolls in Dallas. ROA.9973 Cara Pierce prosecuted a case in which a dancer was recruited into human trafficking at that club. ROA.6317-18, 6336; *see United States v. Mitchell*, 732 F. App'x 298 (5th Cir. 2018).

### 4. Amada Man

The district court also heard the testimony of Amada Man at the preliminary injunction hearing, which was incorporated into the trial record. *See* ROA.11399; Fed R. Civ. P. 65(a)(2). She formerly worked at a strip club called Baby Dolls Saloon in Texas. ROA.11482. During the two months that she worked there, she saw two or three women controlled by pimps, one of whom was under age 21. ROA.11487-88.

## B. The testimony at trial

At the bench trial, three witnesses testified. Dr. Vanessa Bouche and Cara Pierce testified for the Defendants, and Angelina Spencer-Crisp testified for the Plaintiffs. ROA.11612. The district court found Spencer-Crisp's research not credible and found Dr. Bouche and Pierce credible. ROA.11404.

### 1. Dr. Vanessa Bouche

Dr. Bouche holds a master's degree in public affairs from the University of Texas and a Ph.D in political science from Ohio State University. ROA.11701-03.

She has extensively studied statistics and survey research. ROA.11704-05. She has taught classes on human trafficking and survey research. ROA.11706. She has received multiple research grants from the Department of Justice, including to study the effectiveness of state-level legislation in combatting human trafficking, ROA.11707, 11709. Dr. Bouche has also created an online database of all federally-prosecuted human trafficking cases in the United States from the years 2000 through 2022. ROA.11709-10. Presently, Dr. Bouche is a research fellow at Southern Methodist University, an adjunct professor at UT, and consults for nonprofit organizations. ROA.11720.

Dr. Bouche has conducted two surveys of minors who survived sex trafficking in the United States. ROA.11746. The first concluded that approximately 24% had experienced sex trafficking in a strip club. ROA.1752. She explained that although the survey focused on minors, "we don't know if they were minors or if they were adults when they were trafficked in the strip club. We just know that at some point in time, they were trafficked as minors." ROA.11818. In other words, it is possible that some of those surveyed were trafficked as minors, became adults, and then were trafficked in strip clubs as adults. ROA.11818. Her second survey showed that 28% of sex trafficking survivors were trafficked in strip clubs. ROA.6361; *see* ROA.11399 (findings of fact).

Dr. Bouche also testified that there are many different studies about the average age of entry into "commercial sexual exploitation," and the average age is approximately 19 to 20 years old. ROA.11756-57. Her expert report cited six studies, most of which show that the average age of entry into commercial sex is roughly 18 to 20.

ROA.6361. Her report also explained that people under age 21 are more vulnerable to the coercive tactics of traffickers for financial reasons, and that young people have lower levels of psychosocial maturity. ROA.6360.

Dr. Bouche explained that sexually oriented businesses serve as a recruitment ground for trafficking, and it is "well-known that traffickers hang out at strip clubs." ROA.11757; *see* ROA.11759. Traffickers may recruit victims online or elsewhere, but "in order to get that person comfortable with performing sex acts in front of other people, particularly strangers, they will have them dance at a strip club to basically desensitize them." ROA.11759. And "it is also known that victims of sex trafficking dance at strip clubs." ROA.11759.

Dr. Bouche concluded that because the average age of entry for those who are commercially sexually exploited is roughly 19 or 20, and that "strip clubs serve as a place of recruitment, grooming and sale for victims of sex trafficking," she believes that S.B. 315 will help curb human trafficking in Texas. ROA.11759.

### 2. Cara Pierce

Cara Pierce is a former federal prosecutor who worked in the United States Attorney's Office for the Northern District of Texas for twelve years. ROA.11820. There, she served as the human trafficking coordinator and lead prosecutor on most trafficking cases. ROA.11820. She later served as the head of the human trafficking division in the Office of the Texas Attorney General. ROA.11822. Presently, she is a law professor. ROA.11823.

As a federal prosecutor, Pierce prosecuted 46 defendants across 17 cases involving sexually oriented businesses. ROA.11392 n.2. Pierce testified about some of the cases she prosecuted.

Demetrius Byrd liked to entice teenage girls with romance, and "pretty much the day that they turned 18, he'd be causing them to work at various clubs in Dallas and Fort Worth. While they were at the strip clubs, some would engage in commercial sex acts at these establishments." ROA.11836. Byrd's other victims "would meet commercial sex customers that were strip club customers and engage in commercial sex with them outside the strip club and they would give the proceeds to . . . Byrd." ROA.11836.

Jason Howard Moore was another strip club pimp. ROA.11837. He primarily trafficked people over age 18, including by meeting young women at strip clubs. ROA.11837. His victims were "expected to engage in commercial sex acts both in the strip club and outside of the strip club with those customers." ROA.11837.

Allen Nash had an adult victim whom "he met while working at a strip club." ROA.11838. He then caused her to engage in commercial sex in Dallas. Nash had many victims over a large span of time and ultimately received four life sentences. ROA.11838.

Pierce also prosecuted trafficking cases that involved XTC clubs, which she described as "a particularly pimp-known club." ROA.11839.

Pierce also noted that of her cases involving strip clubs, she had encountered victims who did not start off as dancers. She recounted that one victim was a

bartender who later became a dancer, and another was a waitress who also became a dancer. ROA.11865-66.

### 3. Angelina Spencer-Crisp

The Plaintiffs' sole witness at trial was Angelina Spencer-Crisp. ROA.11625-26. She attempted to argue in a paper that less than one percent of human trafficking occurs in strip clubs. ROA.11637; ROA.11397 (findings of fact). But the district court expressly found her conclusions not credible. ROA.11404. It held that it had "significant doubts about the reliability of Spencer-Crisp's empirical research, and ultimately finds it much less credible than the testimony of Pierce or Dr. Bouche." ROA.11404. Spencer-Crisp's conclusions "relied in large part on drawing frequency observations from datasets that disclaim their usefulness for frequency observations." ROA.11404; ROA.11666. Her paper was not published or peer-reviewed. ROA.11681. The district court found her conclusions "not persuasive." ROA.11404.

## C. The district court's opinion

Following trial, the district court issued findings of fact and conclusions of law. The district court concluded that intermediate scrutiny applied to S.B. 315. ROA.11401. Applying the *O'Brien* test, the district court held that S.B. 315 furthers the State's interest in reducing sex trafficking, ROA.11403, and does not restrict substantially more speech than necessary to further that interest, ROA.11405. In the district court's view, S.B. 315 regulated more than necessary to stop sex trafficking because it prohibits all employment of 18-20-year-olds at SOBs, not just dancers. ROA.11406. Nonetheless, non-dancer employees at SOBs "such as janitors, parking valets, and security guards, have no demonstrated First Amendment expression

intertwined with their jobs." ROA.11406. Because those non-expressive positions do not receive First Amendment coverage, S.B. 315 does not implicate substantially more *speech* than necessary to further the State's interests in preventing sex trafficking. ROA.11407-08. The district court also rejected Plaintiffs' overbreadth claim on similar grounds, holding though S.B. 315 "regulates broad swaths of employment at SOBs" it "is not chilling free expression by restricting the age of non-expressive positions." ROA.11409.

This appeal followed.

## Summary of the Argument

S.B. 315 passes intermediate scrutiny because all that the State must show is a (1) reasonable belief that S.B. 315 furthers a substantial state interest and that (2) the law permits reasonable alternative avenues of communication.

First, the evidence shows far more than a reasonable belief that raising the age of employment in SOBs to twenty-one will further the State's interests in preventing human trafficking, prostitution, sexual abuse, and other crimes. Plaintiffs ignore most of this evidence.

Second, S.B. 315 permits reasonable alternative avenues of communication for both businesses and employees. That is because: (1) Plaintiffs admit that the age of employees at strip clubs or other SOBs in no way burdens the *speech* of the *businesses*; (2) non-dancing employees do not engage in speech in the workplace; (3) if they do, they speak only on behalf of their employer whose speech is unaffected; and (4) S.B. 315 permits individual *employees* to engage in nude dancing or distribute adult materials outside of SOBs, even for profit. For similar reasons, S.B. 315 is not overbroad.

The Court reviews findings of fact following a bench trial for clear error and legal conclusions *de novo*. *A&A Concepts, L.L.C. v. Fernandez*, 107 F.4th 478, 483 (5th Cir. 2024). The Court grants "even greater deference to the trial court's findings when they are based on determinations of credibility." *Deloach Marine Servs, L.L.C., v. Marquette Transp. Co., L.L.C.*, 974 F.3d 601, 607 (5th Cir. 2020).

## Argument

## I. S.B. 315 Does Not Violate the First Amendment.

### A. S.B. 315 is subject at most to intermediate scrutiny.

"Nude dancing of the type at issue here is expressive conduct, although it falls only within the outer ambit of the First Amendment's protection." *Doe,* 909 F.3d at 107 (cleaned up).[5]

To determine the appropriate level of scrutiny in cases involving SOB regulations, the Court applies the test adopted in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986). *Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas*, 83 F.4th 958, 963 (5th Cir. 2023). That test asks "whether the measure bans SOBs or regulates only the time, place, and manner of their operation." *Club Executives*, 83 F.4th at 963 (cleaned up). "If the latter, the second step asks whether the regulation is designed to combat the undesirable secondary effects of businesses that purvey sexually

---

[5] Although this authority presently binds this Court, Defendants disagree. "The Constitution does not prevent those communities that wish to do so from regulating, or indeed entirely suppressing, the business of pandering sex." *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 443-44 (2002) (Scalia, J., concurring). Defendants note this argument only to preserve the issue for possible further review.

explicit materials rather than to restrict their free expression." *Id.* (cleaned up) (quoting *Renton*, 475 U.S. at 48-49). If the statute satisfies both steps, then intermediate scrutiny applies. *Id.*

Here, Plaintiffs do not, and could not, dispute that S.B. 315 does not ban SOBs, but rather only regulates the manner of their operation by imposing an age requirement on employees. And as discussed above and as Plaintiffs acknowledge, the statute is designed to combat the secondary effect of human trafficking and other crimes at SOBs. *See* Appellant.Br.22 n.6 (acknowledging that strict scrutiny does not apply under this Court's precedent). "Courts routinely apply intermediate scrutiny to government regulation of sexually oriented businesses." *Fantasy Ranch Inc v. City of Arlington*, 459 F.3d 546, 555 (5th Cir. 2006).

## B.  S.B. 315 passes intermediate scrutiny.

To pass intermediate scrutiny under *Renton*, a statute "must be upheld if it 'is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication.'" *Club Executives*, 83 F.4th at 965 (quoting *Renton*, 475 U.S. at 50). That test largely tracks the *O'Brien* test. The law must be upheld "[1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Doe I*, 909 F.3d at 108 (quoting *O'Brien*, 391 U.S. at 377). As the district court noted, there is no dispute as to the first and third factors, that the Texas Legislature had the power to enact S.B. 315, and that the interest in preventing

human trafficking is unrelated to the suppression of expression. ROA.11402. Accordingly, the *O'Brien* analysis turns on the second and fourth factors, Appellant.Br.22; ROA.11402, which largely tracks *Renton*'s test, with some differences noted below. *See Club Executives*, 83 F.4th at 965.

### 1. S.B. 315 furthers substantial government interests in preventing human trafficking, sexual abuse, and other crimes.

Only by ignoring thousands of pages of evidence can Plaintiffs contend that S.B. 315 does not further the State's interests in preventing not just human trafficking, but sexual abuse and other crimes as well. "The evidentiary burden to support the governmental interest is light. The State has the burden of providing evidence that it reasonably believed to be relevant to the question of secondary effects." *Doe*, 909 F.3d at 109 (cleaned up). "It must show a connection between the actions being regulated"—working in a sexually oriented business—"and the claimed secondary effects"—human trafficking, sexual violence, and other crimes. *Id*. at 109. A statute may be "justified by evidence that may not have been presented to the enacting officials and was only produced at the time of trial." *Id*. at 110. The statute must further the state interest, but the State "need not demonstrate through empirical data . . . that its regulation" will do so. *Id*. Rather, because the State "must have latitude to experiment in addressing secondary effects, very little evidence is required." *Club Executives*, 83 F.4th at 967. The standard does not require the State to show "an ironclad connection between SOBs and secondary effects or to produce studies examining precisely the same conditions at issue." *Id*.

In *Club Executives*, this Court recently clarified the State's burden under *Renton*. "[A]ll *Renton* demands is evidence 'reasonably believed to be relevant' to the problem." *Id*. at 967. A single study and common experience is sufficient. *Id*. at 968.

Nor must the State "rule out every theory for the link between SOBs and secondary effects that is inconsistent with its own" but rather can "instead reasonably interpret the available information without courts replacing the [State's] theory with their own." *Id*. (cleaned up). The State's "latitude to experiment" means that it need not show that its legislation "*will successfully* lower crime" at least "not without actual and convincing evidence from plaintiffs to the contrary." *Id*. "A State has an 'undeniably important' interest in combating the harmful secondary effects associated with nude dancing." *Doe*, 909 F.3d at 107.

S.B. 315 furthers the State's interest in combatting human trafficking and other crime as to all employees it covers. That includes dancers at strip clubs, non-dancing employees at strip clubs, and employees at other SOBs such as adult book and video stores.

### a. Dancers at strip clubs

Raising the age of dancers at strip clubs to twenty-one helps to combat human trafficking and other crime. The evidence showed that: (1) strip clubs facilitate human trafficking of dancers; (2) the age of entry into commercial sexual exploitation is approximately 18-20; (3) crime beyond human trafficking is rampant in strip clubs; (4) minors often impermissibly work in strip clubs but may not be able to pass for twenty-one; and (5) teenagers exercise poorer judgment than older adults.

### i. Strip Clubs facilitate human trafficking of dancers.

Dr. Bouche testified that sexually oriented businesses serve as a recruitment ground for trafficking, and it is "well-known that traffickers hang out at strip clubs." ROA.11757; *see* ROA.11759. Traffickers may recruit victims online or elsewhere, but "in order to get that person comfortable with performing sex acts in front of other people, particularly strangers, they will have them dance at a strip club to basically desensitize them." ROA.11759. And "it is also known that victims of sex trafficking dance at strip clubs." ROA.11759. Dozens of stories corroborate these unfortunate truths.

Nisi Hamilton was controlled by a pimp who had established relationships with strip club owners across Houston. *Supra* 5. The Legislature received a study explaining that "Pimps season women first with stripping and then turn them out into brothels or escort services for more money." ROA.8168. Pimps and drug dealers in strip clubs "seek to engage women in prostitution." ROA.8168. Indeed, one young woman explained "soon after she became involved in stripping, a pimp who posed as a customer in the strip club manipulated her into an escort service by promising that she could make more money in less time simply by accompanying businessmen to dinner." ROA.8168.

Ashley Carnes's declaration explained that while working at a strip club in Dallas, she was recruited into forced prostitution by a pimp. ROA.8965. She knew of dancers who were kidnapped by pimps and even killed. ROA.8966.

TEA's own clubs have experienced sex trafficking. One case involved an eighteen or nineteen-year-old dancer who worked at Bucks in Fort Worth. ROA.9916-17.

She met pimps there, and they eventually caused her to engage in commercial sex. ROA.9917. XTC and Rick's parent company, RCI, has decided to purchase strip clubs where trafficking has occurred, called Chicas Locas in Houston and Baby Dolls in Dallas. *See supra* 18-19.

Amada Man testified that during her two months working at a strip club in Texas, she saw two or three women controlled by pimps, one of whom was under twenty-one. ROA.11487-88.

As a federal prosecutor in the Northern District of Texas, Pierce prosecuted 46 defendants across 17 human trafficking cases that involved sexually oriented businesses. ROA.11392 n.2.

### ii. The age of entry into commercial sexual exploitation is approximately 18-20.

Dr. Bouche testified that there are many different studies about the average age of entry into "commercial sexual exploitation" and that the average age is approximately 19 to 20 years old. ROA.11756-57. Her expert report cited six studies, which respectively concluded that the average age of entry into commercial sex is 20, 19, 20, 19-24, 16, and 18. ROA.6361.

Joe Madison, the director of an organization that addresses the problem of illicit commercial sex in Houston, told the Legislature that sex "buyers" prefer targeting younger performers in strip clubs because they believe younger performers are less likely to have sexually transmitted diseases. *Supra* 12-13.

### iii. Crime beyond human trafficking is rampant in strip clubs.

Crime beyond human trafficking is also rampant in strip clubs. For example, Jessica Wesley testified that she was the victim of numerous sexual assaults. *Supra* 5. The Holsopple study noted that "private dances are situations where women are often forced into acts of prostitution in order to earn tips." ROA.8162. It noted that eighteen women surveyed had been physically and sexually abused in a strip club. ROA.8163. Ashely Carnes's declaration explained that at a strip club where she worked, the VIP rooms were meant for sex, that it was "not a secret." ROA.8965. Investigators found that at strip clubs in El Paso, dancers were willing to engage in commercial sex. ROA.6529, 6531, 6534.

Strip clubs also routinely provide alcohol to minors and commonly feature drug use. Jessica Wesley testified that even though they were underage, her strip club gave her and other eighteen-year-old dancers copious amounts of alcohol, and that club managers commonly looked the other way in the face of underage drinking and drug use. *Supra* 5. Nisi Hamilton reported similar experiences. *Supra* 5. David Sherman, a former club manager, noted that "drug and alcohol use is rampant" in the adult entertainment industry. ROA.8175. Drug dealers also go to strip clubs, and do so "merely for business, selling, giving, and using the girls in [their] drug trade." ROA.8180.

### iv. Minors impermissibly work as dancers in strip clubs.

Nisi Hamilton testified that her pimp made her work at strip clubs even though she was only sixteen. *Supra* 5. She knew of many other teenage girls who were "passed around from club to club." *Supra* 5. She explained that strip clubs gave her

makeup to wear such that she could pass for eighteen, but at age sixteen, she could not pass for twenty-one. *Supra* 5. Lisa Michelle explained how she had encountered twenty-two children ages 13-17 who were victims of human trafficking, and each had worked in an SOB, but it would have been hard for girls of that age to pass for twenty-one. *Supra* 7. Ashley Carnes's declaration from *Doe* also explained that she began working at a strip club at sixteen. ROA.8964. A juvenile court judge from Georgia explained that she knew of cases where children acquired fake identification cards and danced at strip clubs. ROA.6648-49.

Dr. Bouche conducted two surveys of minors who survived sex trafficking in the United States. ROA.11746. One concluded that 24% had been trafficked in a strip club, ROA.11752, and another concluded that 28% had been. ROA.6361; *see* ROA.11399.

### v. Teenagers have poorer judgment than older adults.

As Rafael Salcedo, Ph.D, explained, "brain development in adolescents is not complete until they reach their early to mid-20's." ROA.8982. That is so because "the prefrontal cortex," an area of the brain responsible for judgment, "is one of the latest neurobiological developments in the process of maturation." ROA.8982. Accordingly, "judgment, capacity to anticipate consequences, [and] long term planning ability" can be underdeveloped in individuals ages 18-20. ROA.8983.

Dr. Loretta Sonnier similarly explained that the prefrontal cortex "does not fully exert its control over the emotional and reward processing parts of the brain until the mid-20s." ROA.8989. So, "young adults are more vulnerable to making poor decisions and putting themselves in dangerous situations." ROA.8989. Likewise, Dr.

Bouche noted that young people have lower levels of psychosocial maturity. ROA.6360.

### vi. Putting the pieces together

Human trafficking of dancers is a pervasive problem in strip clubs, and the average age of entry into commercial exploitation is approximately 18-20. Crime such as sexual abuse, commercial sex, and illegal drug and alcohol use is rampant in strip clubs. Given that teenagers often exercise poorer judgment than older adults, it follows that one way to prevent these crimes is to stop young people from working at strip clubs. Minors also impermissibly dance at strip clubs. Because it is harder for teenage girls to pass for 21 than 18, raising the employment age helps to solve this problem.

So S.B. 315 furthers multiple substantial state interests. But even if it did not, the evidence shows "a reasonable belief that there is a link between the regulation and the curbing of the identified secondary effects." *Doe*, 909 F.3d at 110. That is all the Court requires.

### b. Other employees of strip clubs

Requiring non-dancing employees of strip clubs to be at least twenty-one also furthers the State's interest in preventing human trafficking and other crimes.

David Sherman, a former strip club manager, explained why non-dancing employees at strip clubs are vulnerable to exploitation. *See* ROA.11395 (citing this report). Strip club managers hire young women as non-dancers in order to groom them into becoming dancers. Sherman explained that young women usually do not want to be strippers, and so "most of the time are hired as waitresses, even though

waitresses are not needed." ROA.8175. While working as waitresses, they become desensitized to the strip club atmosphere, so they begin to see stripping as a job and "are converted quite easily to dancing." ROA.8175. Sherman spoke of three young women who all started as waitresses and later became dancers. ROA.8176-77.

This practice is deliberate. According to Sherman, *all* female employees in strip clubs are "treated as a potential dancer. It really doesn't matter if she's hired as a waitress, hostess, or even a bartender." ROA.8177. Club managers intentionally manipulate these young women into becoming dancers. They employ tricks by telling female employees that the club is short-staffed on dancers for a given night and ask the female employee to help. ROA.8177. Managers will also make these young women feel guilty about not wanting to help the club. ROA.8178. Managers will make their waitresses and bartenders feel needed onstage, ROA.8177, or tell them they are no longer needed in their current job, but can dance if they wish to remain employed, ROA.8178.

This practice is consistent with Pierce's prosecutions. She recounted two victims who began as bartenders and waitresses and later became dancers. ROA.11865-66. Again, this evidence shows a "reasonable belief that there is a link between the regulation and the curbing of the identified secondary effects." *Doe*, 909 F.3d at 110. Non-dancing employees become dancers by design, at which point they become vulnerable to trafficking, sexual abuse, and prostitution.

### c. Employees at other SOBs

Other types of SOBs like adult book and video stores facilitate sex trafficking and prostitution. These stores do not resemble Barnes & Noble or old Blockbuster stores.

Rather, their business models include providing private rooms in which human trafficking and prostitution occur.

Investigators were quoted prices for live nude shows at an adult video store in the private back rooms. ROA.6518. They also found booths with holes in the walls for sex. ROA.6519.

Professor Richard McCleary's study explained that the model of adult video stores that combines the sale of adult DVDs with private viewing booths "continues to flourish." ROA.7130. Justice Souter called this business model "commercially natural, if not universal." *Alameda Books*, 535 U.S. at 465 (Souter, J., dissenting). And private "viewing booths create opportunities for sexual contact." ROA.7310.

A study of the City of Austin that included adult bookstores and adult theaters, ROA.6926, showed that sexually related crime in areas with SOBs ranged from 177-482% higher than the city average. ROA.6926. A study of Houston noted that "[l]ocked rooms within SOBs are usually fronts for prostitution." ROA.6933. Houston police officers also explained adult bookstores "are nothing more than just blatant open sexual contact between people with complete anonymity." ROA.6948. Indeed, "random sexual activity between males is rampant." ROA.6948. One officer stated that "in his eleven years with Vice he does not recall ever seeing anyone go into a booth, watch a movie for thirty minutes and walk out." ROA.6948.

New Fine Arts allows two people into its private rooms at once, and rooms lock from the inside. ROA.9835. Customers pay for the room, ROA.9835, and the business does not want to know what's "going on behind closed doors," ROA.9835. It

has "taken no steps" regarding human trafficking, ROA.9843, and in doing so, facilitated the sex trafficking crimes of Martavious Keys. ROA.9865.

This is more than enough evidence to show "a reasonable belief that there is a link between the regulation and the curbing of the identified secondary effects." *Doe*, 909 F.3d at 110. Sex trafficking and prostitution happens, or is at least at great risk of happening, at these adult stores. It is reasonable to believe that preventing teenagers with poor judgment from working at those places every day will help to prevent them from becoming victims.

### 2. Plaintiffs' arguments are meritless.

Plaintiffs' attempts to discredit and minimize the testimony of Dr. Bouche are meritless. The district court found her testimony credible, ROA.11404, and Plaintiffs have forfeited the issue of whether that finding was clearly erroneous by failing to brief it. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021). In any event, Plaintiffs point to Dr. Bouche's database of 1,500 federal trafficking prosecutions and contend that only 29 involved sex trafficking inside strip clubs. Appellant.Br.14. But as Dr. Bouche credibly testified, that is misleading. That data is limited by information in pleadings such as indictments, affidavits, and sentencing memos, and information in pleadings is "really at the behest of the level of detail that the prosecutors put in those case documents." ROA.11814; *see* ROA.11832-33 (Pierce's testimony on this point). Further, Bouche's database of federal prosecutions should not be used to extrapolate the prevalence of human trafficking, ROA.11710, 11814, because federal prosecutions are brought strategically, "and there are specific types of cases that are prioritized." ROA.11739. Sometimes prosecutors charge crimes other

than human trafficking to make the prosecution easier. ROA.11714. And data about federal trafficking prosecutions has nothing to say about state prosecutions. At bottom, Plaintiffs attempt to use Dr. Bouche's prosecution database in the same way that made Spencer-Crisp's testimony not credible: They attempt to use it to show prevalence when it cannot be used for that purpose. *See* ROA.11404.

Plaintiffs also attempt to criticize Dr. Bouche's survey research, Appellant.Br.14-15, specifically her two surveys concluding that 24% and 28% of child sex trafficking victims had been trafficked in a strip club, Appellant.Br.14. That those surveys involved children still makes them valuable evidence. *Contra* Appellant.Br.14. That is because "all *Renton* demands is evidence reasonably believed to be relevant to the problem," and does not require the State "to forge an ironclad connection between SOBs and secondary effects or to produce studies examining precisely the same conditions at issue." *Club Executives*, 83 F.4th at 967. That minors are victims of sex trafficking in strip clubs shows that those over eighteen can be too, as other evidence discussed above shows. And information about minors being trafficked in strip clubs is particularly important because one "current governmental interest," *Fantasy Ranch*, 459 F.3d at 560, that justifies S.B. 315 is to prevent minors who can pass for eighteen but not twenty-one from working at SOBs.

Plaintiffs' attempts to discredit Dr. Bouche's survey methodology also rings hollow. *See* Appellant.Br.14-15. The district court found her conclusions credible, ROA.11404, and cited her findings, ROA.11399. Plaintiffs also ignore that the district court expressly found that "Defendants have introduced convincing evidence that sex trafficking occurs in SOBs at higher rates than other businesses, and they have

introduced evidence that young adults are frequent victims of trafficking," ROA.11403, one of the major points of Dr. Bouche's survey research. But even if Dr. Bouche's surveys were omitted, it would change nothing. Defendants need only provide evidence that is "reasonably believed to be relevant" and "need not demonstrate through empirical data . . . that its regulation will reduce such trafficking." *Doe*, 909 F.3d at 110. Other evidence discussed above shows that sex trafficking happens in strip clubs to both adults and minors. *Supra* 5-6.

Plaintiffs attempt to discredit Pierce's testimony is equally meritless. The district court found her testimony credible too, ROA.11404, and Plaintiffs have not argued that finding was clearly erroneous. In any event, Plaintiffs incessantly attack Pierce's testimony that of the 81 human trafficking cases she prosecuted, 46 involved SOBs. Appellant.Br.18-22. But the purpose of that testimony, when combined with other evidence, was to show what the district court found as a matter of fact: "Defendants have introduced convincing evidence that sex trafficking occurs in SOBs at higher rates than other businesses." ROA.11403. Regardless, Plaintiffs' attempt to minimize her prosecutions was credibly refuted. That Pierce prosecuted 46 *defendants,* some of whom were co-defendants in 17 *cases*, as the district court noted, ROA.11392 n.2, still shows evidence "reasonably believed to be relevant" *Doe*, 909 F.3d at 110. And attempting to use federal pleadings to determine whether a given case involved an SOB is not appropriate. *Contra* Appellant.Br.20-22. As Pierce explained, one should not use her pleadings to determine if a given case involved an SOB because that information is not consistently in her pleadings. ROA.11832-33; *see* ROA.11814 (Dr. Bouche's testimony regarding the use of federal pleadings).

Plaintiffs also ignore that "almost all" of the *adult* trafficking victims that Pierce encountered were under the age of twenty-one. Senate Committee on Jurisprudence, *supra*, at 44:25-55.

Plaintiffs' contentions that there is no evidence of non-dancers at strip clubs or employees of adult book and video stores being trafficked is legally irrelevant and factually misleading. Appellant.Br.28. *Renton* does not require the State "to forge an irconclad connection between SOBs and secondary effects or to produce studies examining precisely the same conditions at issue," and States "must have latitude to experiment in addressing secondary effects." *Club Executives*, 83 F.4th at 967. Plaintiffs cite no case explaining that *Renton* requires the State to permit sex trafficking to occur rather than preventing it in the first place.

And factually, Plaintiffs' contentions are misleading. As Sherman explained, all female employees in adult entertainment nightclubs are "treated as a potential dancer." ROA.8177. Sherman explained the manipulative process that club managers use to convert these types of employees into dancers. ROA.8167. And Pierce recounted two such victims. ROA.11865-66. So, while the district court found that non-dancing employees are "not likely to be trafficked," ROA.11407, club managers still manipulate other employees into becoming dancers. Once dancers, those individuals are "most likely to be sex trafficked." ROA.11407.

That Bouche and Pierce were not aware of employees being trafficked inside of adult book and video stores also misses the point factually. Appellant.Br.28. There is unquestionably evidence that prostitution and other crimes occur at adult book and video stores, and those are secondary effects worth preventing too. *Doe*, 909

F.3d at 109-110; *see supra* 35-36 (Austin and Houston studies); ROA.6518-23 (investigative report of adult video store). And it is reasonable to believe that preventing teenagers from working in those businesses will prevent them from becoming victims.

Finally, that Pierce and Bouche lacked evidence of young men being trafficked is irrelevant. *Cf.* Appellant.Br.28. The evidence shows that teenagers of both genders exercise less judgment, and that strip clubs commonly feature rampant drug and underage alcohol use, prostitution, and sexual abuse. It is reasonable to believe that if eighteen-year-old men work in these environments daily, then they might normalize these behaviors and become participants or victims themselves. Houston police also explained that adult bookstores "are nothing more than just blatant open sexual contact between people with complete anonymity" and "random sexual activity between males is rampant." ROA.6948. It is reasonable to believe that eighteen-year-old men who work in such an environment daily may also become victims or participants of sexual abuse, trafficking, or prostitution, even if less commonly than females.

### 3. S.B. 315 permits reasonable alternative avenues of communication.

S.B. 315 permits "reasonable alternative avenues of communication" which is all that *Renton*'s second prong and *O'Brien*'s fourth require. *Club Executives*, 83 F.4th at 964, 969. As this Court has explained, this prong is not a least restrictive means test. *Doe*, 909 F.3d at 111. "A regulation need not be costless to be valid," and while a State may not use its regulations "to *eliminate* businesses as a means to reduce their secondary effects," plaintiffs simply need "a 'reasonable opportunity to

open and operate' their businesses." *Club Executives*, 83 F.4th at 969 (quoting *Renton*, 475 U.S. at 54).

>    a.    **The age of dancers and other employees does not alter the *businesses'* speech.**

Nothing about the age of their employees restricts the message the Plaintiff businesses convey. Nor have their businesses materially changed since S.B. 315 was passed. Spencer-Crisp, Plaintiffs' own expert, testified that the ability to hire "18-year-old girls to take their clothes off" is "not important to the business model" of a strip club, ROA.11692, and agreed that the "age of the dancer is not important to the sexual expression of the dancer," ROA.11693. Ricks and XTC do not in any way advertise the age of their dancers. ROA.9962. As their corporate representative testified, their customers have not requested "teenage perform[ers]," the clubs do not introduce dancers as "being barely legal," they did not mention that their dancers were teenagers prior to S.B. 315's enactment, and the age of their dancers are not highlighted in any way. ROA.9962. Nor is there a different performance that a teenage dancer might perform as opposed to an older one. ROA.9963.

As for New Fine Arts, it has not changed its merchandise, services, or made any changes regarding its private rooms because of S.B. 315. ROA.9839. Nor has S.B. 315 affected its profits. ROA.9839. Indeed, New Fine Arts's "hiring practices are just like any other retail establishment." ROA.11262. They place job postings online and hire managers, store clerks, and security guards. ROA.10032-34. Those employees carry out ordinary duties. As New Fine Arts has argued, they sell their materials, "restock the shelves, provide customer service, and keep an eye out for shoplifters."

ROA.11262; *see* ROA.10030. Whether their employees are eighteen or twenty-one has nothing to do with any of those services, much less the speech the store's materials convey.

In sum, the age of dancers, store managers, security guards, and clerks at these SOBs has nothing to do with the message conveyed and "Plaintiffs do not argue that the [statute] will be so costly as to drive them out of business." *Club Executives*, 83 F.4th at 969. "[T]he First Amendment requires only that [the State] refrain from effectively denying [Plaintiffs] a reasonable opportunity to open and operate" an adult business. *Renton*, 475 U.S. at 54. Plaintiffs have that opportunity.

### b. S.B. 315 permits reasonable avenues of communication for *employees* of SOBs.

To the extent that Plaintiffs contend that S.B. 315 somehow unconstitutionally restricts the First Amendment rights of their *employees*, they are wrong for several reasons. Of course, there are no individual employees before this Court because those former plaintiffs turned twenty-one and were dismissed from the case. ROA.11388. But even if there were, S.B. 315 does not unconstitutionally restrict their First Amendment rights.

*First*, while S.B. 315 prevents those ages 18-20 from working at an SOB, the vast majority of those employees do not engage in speech in the workplace. The party invoking the First Amendment's protection has the burden to prove that it applies. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013). The First Amendment protects speech and only "inherently expressive" conduct. *Id*. And as the district court explained, employees at SOBs "such as janitors, parking valets, and security

guards, have no demonstrated First Amendment expression intertwined with their jobs." ROA.11406. The same is true of bartenders, waitresses, store clerks, accountants, and managers, whether they work at a strip club, or an adult book and video store. *See Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1254 (5th Cir. 1995); ROA.11407.

*Second*, even if those employees speak in the workplace, they are speaking on behalf of their employer. Plaintiffs point to the testimony of a New Fine Arts employee who sells adult magazines there "in her employment capacity." Appellant Br.30. But that's just it. Speech that "owe[s] its existence" to the employee's "professional responsibilities" or is otherwise "for the benefit of the employer," is the employer's speech, not the employee's. *Bevill v. Fletcher*, 26 F.4th 270, 278 (5th Cir. 2022). Accordingly, when employees sell adult materials or engage in any other conduct in the workplace in their professional capacity for the benefit of their employer, they are distributing their employer's speech. Store employees do not sell their own adult materials in the store, they sell their employer's. To the extent that bartenders, waitresses, managers, or security guards engage in expressive conduct while at work, the same rule applies.

*Third,* because SOB employees do not speak on behalf of themselves at work, (if, at all) with the possible exception of dancers, their speech is not burdened in any way. In other words, Plaintiffs conflate the right to speak with employment at an SOB. But the "inquiry for First Amendment purposes is not concerned with economic impact," *Renton*, 475 U.S. at 54, and although *businesses* require a "reasonable opportunity to open and operate," *Club Executives,* 83 F.4th at 969, there is no First

Amendment right for individuals to be employed at a specific type of business. And SOB employees can earn money by dancing or distributing adult materials in other locations because of the way in which S.B. 315 is written.

S.B. 315 prohibits 18-20-year-olds only from employment with certain types of *businesses*. It prohibits "employing or entering into a contract for the performance of work or the provision of a service with an individual younger than 21 years of age for work or services performed at a sexually oriented business." Tex. Civ. Prac. & Rem. Code § 125.0015(a)(19). Further, "[a] sexually oriented business may not employ or enter into a contract . . . for the performance of work or the provision of a service with an individual younger than 21 years of age." Tex. Labor Code § 51.016(b). Finally, "[a] person commits an offense if the person employs, authorizes, or induces a child to work: (1) in a sexually oriented commercial activity;[6] or (2) in any place of business permitting, requesting, or requiring a child to work nude or topless." Tex. Penal Code § 43.251(b), (b)(1)-(2). These provisions regulate only employment or contracting with *certain businesses*. Individuals may still earn money by engaging in nude dancing, such as by contracting to perform at events on private premises. S.B. 315 does not restrict any SOB employees, even dancers, from engaging in nude dancing or distributing adult materials outside of an SOB, even for profit.

---

[6] "Sexually oriented commercial activity" is defined to include only certain types of "commercial enterprise[s]," that is, businesses. Tex. Penal. Code § 43.251(5).

## 4. Plaintiffs' arguments as to *Renton*'s second prong fail.

### a. Plaintiffs apply the wrong standards.

Plaintiffs incorrectly attempt to hold Defendants to the wrong standard when applying *Renton*'s second prong. *Renton* held that the First Amendment is not concerned with economic impact, and "requires only that [the state] refrain from effectively denying [SOBs] a reasonable opportunity to open and operate." *Renton*, 475 U.S. at 54; *see J&B Ent., Inc. v. City of Jackson*, 152 F.3d 362, 378 (5th Cir. 1998). Interpreting *Renton*, this Court has held that a "regulation need not be costless to be valid," so long as the State does not use its laws to drive SOBs out of business. *Club Executives*, 83 F.4th at 969. That is what it means to permit "reasonable alternative avenues of communication." *Id*. at 964.

Plaintiffs ignore this binding authority. Instead, they discuss cases about campaign finance laws and the right to film the police for the proposition that the First Amendment protects the process of creating speech. *See* Appellant.Br.32-33 (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003)). But those are not secondary effects cases, and in the secondary effects context, the State *can* place some burdens on the speech-creation process, so long as it leaves open reasonable alternative avenues of communication. *Contra* Appellant.Br.32-34. That is why States may require dancers at alcohol-licensed clubs to be twenty-one years old, *Doe*, 909 F.3d at 104-05, or require SOBs to close entirely between 2:00am and 6:00am, *Club Executives*, 83 F.4th at 961-62. Those restrictions

burden speech in some way, but they are permissible because they allow for alternative avenues of communication.

Similarly, Plaintiffs cite *McCullen v. Coakley*, 573 U.S. 464 (2014), in an improper attempt to suggest that Defendants must demonstrate other measures to combat human trafficking would be ineffective. Appellant.Br.41-43. But *McCullen* is not a secondary effects case. Rather, it is about a state statute that criminalized standing on a street or sidewalk within 35 feet of the entrance to abortion clinics. *McCullen*, 573 U.S. at 469. For that reason, it applied a version of intermediate scrutiny *different* from the *Renton* test. It held that "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *Id*. at 495. But that is not the *Renton* test; it is a different version of intermediate scrutiny, and this Court has held that calling the second prong of *Renton* "narrow tailoring" is a misnomer. The Court has "sometimes observed that restrictions on SOBs must also be narrowly tailored. But later precedents have explained that a restriction that satisfies *Renton*'s formulation is necessarily narrowly tailored." *Club Executives*, 83 F.4th at 965 n.8 (citation omitted). "*Renton*'s formulation" is "reasonable alternative avenues of communication." *Id*. at 965, 965 n.8. In other words, *Club Executives* clarified that under *Renton*, the concept of "narrow tailoring" is different in the secondary effects context than in other First Amendment cases. Accordingly, it is not Defendants' burden to show that less restrictive measures would fail to achieve the State's interests. Similarly, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) is not a

secondary effects case, did not cite *Renton* or apply any form of intermediate scrutiny, and is not relevant here. *Cf.* Appellant.Br.40.

Plaintiffs' discussion of *Illusions—Dallas Private Club, Inc. v. Steen*, 482 F.3d 299 (5th Cir. 2007), adds nothing to their argument. Appellant.Br.34-35. They cite passages in that opinion for the simple proposition that the First Amendment *applies* to this case in the first instance, a separate inquiry from whether S.B. 315 passes the *Renton* test. *See Illusions*, 482 F.3d at 307.[7]

Finally, Plaintiffs' reference to *Doe* changes nothing. *Contra.* Appellant.Br.38. *Doe* upheld a Louisiana statute requiring that dancers at strip clubs licensed to serve alcohol must be twenty-one. 909 F.3d at 104-05. In analyzing *O'Brien*'s fourth prong, it held that the "State has also demonstrated that its regulation does not burden substantially more speech than is necessary because it prohibits semi-nude dancing for 18-20-year-old individuals in alcohol-licensed clubs only; they may still participate in expressive conduct in non-alcohol-licensed establishments." *Id.* at 113. Citing this passage, Appellant.Br.37-38, Plaintiffs make several mistakes. First, they improperly attempt to apply *expressio unius* to a judicial opinion. Second, they note that S.B. 315 deprives "adult citizens" of the right to dance at these clubs, when no such plaintiffs are before the Court. Contrarily, *Doe* involved the rights of dancers, not businesses, 909 F.3d at 105-06, and the businesses here have admitted that the

---

[7] Defendants disagree with the Court's decision in *Illusions* to the extent that it holds that a statute regulating entirely non-expressive activity of an SOB implicates the First Amendment at all. *See Illusions*, 482 F.3d at 307. Defendants note this to preserve this argument for possible further review.

age of the dancers does not affect their speech, *supra* 41-42. S.B. 315 also does not prohibit dancers from earning money at venues other than SOBs such as events on private premises, *supra* 44, so they have reasonable alternative avenues of communication.

### b. Plaintiffs incorrectly view the facts.

Plaintiffs make much of Dr. Bouche's statements that, in her view, if S.B. 315 had only restricted the age of employment of dancers in strip clubs to twenty-one, and not all other SOB employees, then it would address most dangers of human trafficking. Appellant.Br.16-17. Plaintiffs similarly emphasize the district court's findings that non-dancing employees "are not likely to be trafficked," ROA.11407, and that S.B. 315 "plainly regulates more than necessary to stop sex trafficking, as it prohibits all employment of 18- to 20-years olds at SOBs," ROA.11406; Appellant.Br.35-36. None of that matters.

First, those statements ignore that S.B. 315 has other goals beyond preventing sex trafficking, and the "appropriate focus is not an empirical inquiry into the actual intent of the enacting legislature, but rather the existence or not of a *current governmental interest* in the service of which the challenged application of the statute may be constitutional." *Fantasy Ranch,* 459 F.3d at 560. S.B. 315 serves many current governmental interests beyond just preventing sex trafficking. As discussed above, that includes preventing minors from working in strip clubs, preventing illegal drug and alcohol use, and preventing prostitution, all vis-à-vis teenagers with poorer judgment than older adults.

Second, neither Dr. Bouche's statements nor the district court's findings alter the conclusion that S.B. 315 still permits reasonable avenues of communication. As explained above, S.B. 315 in no way affects the businesses' speech, *supra* 41, the businesses' employees do not speak for themselves (if at all) in the workplace, and even if they did, all employees, whether dancers or store clerks, may engage in nude dancing or distributing adult materials outside of the workplace, even for profit, *supra* 44.

## II. S.B. 315 is Not Overbroad.

The "overbreadth doctrine enables litigants to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Doe*, 909 F.3d at 108. The overbreadth of a statute "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id*. Although the concept of First Amendment overbreadth is doctrinally separate from the fourth prong of *O'Brien*, *id*. at 108, "satisfying *O'Brien*, when that is the appropriate test, will usually obviate the need" to analyze overbreadth. *Id*. at 111.

Because this doctrine "destroys some good along with the bad, [i]nvalidation for overbreadth is strong medicine that is not to be casually employed." *United States v. Hansen*, 599 U.S. 762, 770 (2023). A law's unconstitutional applications must be "substantially disproportionate to the statute's lawful sweep." *Id*. "In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do—case-by-case." *Id*. Critically, the overbreadth doctrine focuses exclusively on whether a statute prohibits too much *speech* relative to its lawful applications. *Id*.

Whether a law regulates non-speech activities is not relevant to the overbreadth analysis.

As explained above, S.B. 315 has no unconstitutional applications so it cannot be overbroad. But even if S.B. 315 impermissibly regulated 18-20-year-old employees other than dancers at strip clubs, as Plaintiffs suggest, Appellant.Br.44, it would still not be overbroad for largely the same reasons that it satisfies the second prong of *Renton* and fourth prong of *O'Brien*. For the reasons explained above: (1) restricting the age of non-dancing employees at strip clubs or employees of adult book and video stores in no way burdens the *speech* of the *businesses*; (2) non-dancing employees do not engage in speech in the workplace; (3) if they do, they speak only on behalf of their employer whose speech is unaffected; and (4) S.B. 315 permits individual *employees* to engage in nude dancing or distribute adult materials outside of SOBs, even for profit, *supra* 41-44.

## Conclusion

The Court should affirm the judgment of the district court.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Aaron L. Nielson
Solicitor General

/s/ Benjamin Wallace Mendelson
Benjamin Wallace Mendelson
Assistant Solicitor General
Ben.Mendelson@oag.texas.gov

Counsel for Appellees

## CERTIFICATE OF SERVICE

On December 4, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Benjamin W. Mendelson
BENJAMIN W. MENDELSON

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,998 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Benjamin W. Mendelson
BENJAMIN W. MENDELSON