## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————————————

Texas Entertainment Association, Incorporated; Lone Starr Multi- Theaters, Limited, doing business as New Fine Arts West; XTC Cabaret, Incorporated, doing business as XTC Cabaret Austin; RCI Dining Services (Round Rock), Incorporated, doing business as Rick's Cabaret,

*Plaintiffs-Appellants,*

*v.*

Ken Paxton, Attorney General, State of Texas; Ed Serna, in his official capacity as Executive Director of the Texas Workforce Commission,

*Defendants-Appellees.*

———————————————————
On Appeal from the United States District Court
for the Western District of Texas, Austin Division

———————————————————

### REPLY BRIEF OF APPELLANTS
———————————————————

J. MICHAEL MURRAY (Ohio 0019626)
jmmurray@bgmdlaw.com
WILLIAM C. LIVINGSTON (Ohio 0089538)
wlivingston@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN
55 PUBLIC SQUARE SUITE 2200
CLEVELAND, OHIO 44113-1949
(216) 781-5245 / Fax: (216) 781-8207

CASEY T. WALLACE (Texas 00795827)
cwallace@wallaceallen.com
WALLACE & ALLEN, LLP
440 Louisiana Suite 590
Houston, Texas 77002
Tel. (713) 227-1744 / Fax: (713) 600-0034

Attorneys for Plaintiffs-Appellants

CERTIFICATE OF INTERESTED PERSONS

Case No. 24-50434
*Texas Entertainment Assoc. Inc., et. al., v. Paxton, et. al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.   Texas Entertainment Association, Inc., Plaintiff-Appellant;

2.   Lone Star Multi- Theatres, Ltd., d/b/a New Fine Arts West, Plaintiff-Appellant;

3.   XTC Cabaret, Inc.,d/b/a XTC Cabaret Austin, Plaintiff-Appellant whose parent corporation is RCI Hospitality Holdings, Inc., a publicly traded corporation that holds 10% or more of XTC Cabaret, Inc's stock;

4.   RCI Dining Services (Round Rock), Inc., d/b/a/ Ricks Cabaret, Plaintiff-Appellant, whose parent corporation is RCI Hospitality Holdings, Inc., a publicly traded corporation that holds 10% or more of RCI Dining Services (Round Rock), Inc's stock.

5.   RCI Holdings Hospitality, Inc., a publicly traded corporation and parent of Plaintiff-Appellants XTC Cabret, Inc. and RCI Dining Services (Round Rock), Inc. holding 10% or more of their stock.

6.    J. Michael Murray, Berkman, Gordon, Murray & DeVan, Attorney of Record for Plaintiffs-Appellants;

7.   William C. Livingston Berkman, Gordon, Murray & DeVan, Attorney of Record for Plaintiffs-Appellants;

8.   Casey T. Wallace, Wallace & Allen, LLP, Attorney of Record for Plaintiffs-Appellants;

9.   Ken Paxton, Attorney General of Texas, Defendant-Appellee;

10.  Ed Serna, Executive Director of the Texas Workforce Commission, Defendant-Appellee;

11.     Benjamin Wallace Mendelson, Assistant Solicitor General of Texas, Attorney
        of Record for Defendants-Appellees;

12.     Brent Webster, First Assistant Attorney General of Texas
        Attorney for Defendants-Appellees;

13.     Aaron L. Nielson, Solicit General of Texas;
        Attorney for Defendants-Appellees.


                              /s/ J. Michael Murray_____
                              Attorney of Record for Plaintiffs-Appellants

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. DEFENDANTS' MISCHARACTERIZATIONS OF PLAINTIFFS . . . . . . 3

    A.    New Fine Arts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The Texas Entertainment Association. . . . . . . . . . . . . . . . . . . . . . 7

    C.    XTC and Rick's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    D.    Adult Entertainers Take Their Artistic Performances Seriously, They Come From All Walks Of Life, And Adult Nightclubs Provide Entertainers With Opportunities For Economic Freedom and Stability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II. S.B. 315 CANNOT SURVIVE INTERMEDIATE SCRUTINY . . . . . . . . 14

    A.    The *Renton* Formulation Requires That a Secondary Effects Regulation Target Only The Sources Shown To Produce The Claimed Adverse Secondary Effects . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.    The District Court's Findings Of Fact. . . . . . . . . . . . . . . . . . . . . . 18

    C.    As Applied To Adult Bookstores/Arcades And To Adult Nightclub Personnel Other Than Entertainers, S.B. 315 Is Unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        1.    Employees At Adult Bookstores/Arcades. . . . . . . . . . . . . . . 20

        2.    Non-Performing Adult Nightclub Employees . . . . . . . . . . . 22

3.    Under *Illusions-Dallas Private Club v. Steen*, 482 F.3d 299 (5th Cir. 2007), S.B. 315's Total Ban Of 18-20 Year-Old Non-Performing Employees Working at Sexually Oriented Businesses Must Further the State's Interest in a Narrowly Tailored Way . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

D.    Even As Applied to the Prohibition On Sexually Oriented Businesses Hiring 18-20 Year Olds As Dancers, S.B. 315 Is Unconstitutional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III.    S.B. 315 IS UNCONSTITUTIONALLY OVERBROAD UNDER THE FIRST AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS 30

# TABLE OF AUTHORITIES

Page

<u>CASES</u>

*Association of Club Executives v. City of Dallas*,
    83 F.4th 958 (5th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-18

*Bantam Books, Inc. v. Sullivan,* 372 U.S. 58 (1963) . . . . . . . . . . . . . . . . . . . . . . 22

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) . . . . . . . . . . . . . . . . . . . . . . . 14

*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bevil v. Fletcher*, 26 F.4th 270 (5th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Cablevision Sys. Corp. v. F.C.C.,*
    597 F. 3d 1306 (D. C. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*City of Los Angeles v. Alameda Books*,
    535 U.S. 425 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) . . . . . . . . . 14-16, 24

*Doe I v. Landry*, 909 F.3d 99 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 26

*Encore Videos, Inc. v. City of San Antonio*,
    330 F.3d 288 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Greenberg v. Crossroads Sys., Inc.*,
    364 F. 3d 657 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*H and A Land Corp. v. City of Kennedale*,
    480 F.3d 336 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hines v. Pardue,* 117 F.4th 769 (5th Cir. 2024) . . . . . . . . . . . . . . . . . 14, 23, 25, 26

*Illusions–Dallas Private Club, Inc. v. Steen*,
    482 F.3d 299 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 23, 24

v

*McCullen v. Coakley*, 73 U.S. 464 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*New York Times v. Sullivan*, 376 U.S. 254 (1964). . . . . . . . . . . . . . . . . . . . . . . . 22

*Siders v. City of Brandon*, --- F.4th ----,
    2024 WL 5065550 (5th Cir. Dec. 11, 2024) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Simon & Schuster, Inc. v. Members of New York*
    *State Crime Victims Bd.*, 502 U.S. 105 (1991) . . . . . . . . . . . . . . . . . . . . . . 22

*Smith v. California*, 361 U.S. 147 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Tex. Ent. Assoc., Inc. v. Hegar*, 10 F. 4th 495 (5th Cir. 2021) . . . . . . . . . . . . . . . 7

*Turner Broad Sys., v. FCC*, 512 U.S. 622 (1994) . . . . . . . . . . . . . . . . . . . . . . . . 14

*U. S. v. X-Citement Video, Inc.*,
    513 U.S. 64 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Keys*, 747 Fed. Appx. 198 (5th Cir. 2018). . . . . . . . . . . . . . . . . . 6

*United States v. Keys*, No. 3:16-cr-00244-N (N.D. Tex). . . . . . . . . . . . . . . . . . . . . 6

*United States v. O'Brien*, 391 U.S. 367 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CONSTITUTIONAL PROVISIONS

United States Const., amend I . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5, 16, 20-25, 27, 28

United States Const., amend XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

STATUTES, RULES AND REGULATIONS

Fed. R. Civ. Procedure 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 10

<u>MISCELLANEOUS</u>

1 *Smolla & Nimmer on Freedom of Speech* §9:17 (2018). . . . . . . . . . . . . . . . . . . 26

Senate Research Center, Bill Analayis, Tex. S.B. 315,
      87th Leg. R.S. (2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## INTRODUCTION

As the district court stated, "[t]his case concerns Texas Senate Bill 315, 87th Leg. R.S. (2021) ("S.B. 315"), a recently enacted Texas law that prohibits adults under 21 years of age from working at sexually oriented businesses ("SOBs"), with the goal of reducing sex trafficking." ROA.11389.

It found, as a factual matter, that "Texas justified S.B. 315 as solving a need to 'provide necessary mechanisms to safeguard our communities and children from trafficking and sexual exploitation, which are often harmful secondary effects of sexually oriented businesses.'" ROA. 11390 *quoting* Senate Research Center, Bill Analayis, Tex. S.B. 315, 87th Leg. R.S. (2021).

Indeed, in the court below, the State defended S.B. 315 in the face of Plaintiffs' First Amendment challenge on that basis and the parties tried the case on that theory.

What stands out from Defendants' brief in this Court is that they essentially sidestep the critical findings of fact by the district court on that very issue and Plaintiffs' primary arguments on appeal.

The district found, *inter alia*, that "S.B. 315 plainly regulates more than necessary to stop sex trafficking, as it prohibits all employment of 18-to-20-year-olds at SOBs. This ban applies regardless of whether those employment positions are considered vulnerable to trafficking." ROA.11406.

It further found that employees who work at sexually oriented businesses in

positions other than dancers, "are not likely to be trafficked..." ROA. 11407. Nonetheless, "S.B. 315 regulates broad swaths of employment at SOBs, regardless of whether they are tied to sex trafficking." ROA. 11409. Thus, "S.B. 315 sweeps broader than necessary..." ROA. 11407.

Defendants do not contend that these findings are clearly erroneous. Nor could they as their own expert conceded those facts.

Nor, in their brief, do the Defendants offer a head-on convincing response to the Plaintiffs' main legal argument in this appeal: the district court erred in its legal conclusion that, despite its factual findings recounted above, S.B. 315 nevertheless survives intermediate scrutiny, on the theory that employees at sexually oriented businesses, other than dancers, do not engage in expressive activities. And they essentially relegate this Court's precedent of *Illusions–Dallas Private Club, Inc. v. Steen*, 482 F.3d 299 (5th Cir. 2007) to a footnote, stating that they simply disagree with it. *See* Appellee Brief at p. 47, n. 7.

Instead, Defendants spend a substantial portion of their brief maligning sexually oriented businesses and the citizens who operate them. And they proceed to make personal and unjustified attacks against the Plaintiffs themselves. Defendants apparently believe, if they can cite enough of the one-sided legislative record, submitted by advocates who oppose adult entertainment, and impugn the character

2

of the Plaintiffs, they can justify S.B. 315 regardless of whether it actually furthers its stated interest.

But, in the end, the district court's finding of fact and the relevant law compels the conclusion that S.B. 315 cannot survive intermediate scrutiny under the First Amendment.

I.    DEFENDANTS' MISCHARACTERIZATIONS OF PLAINTIFFS

A.    New Fine Arts

New Fine Arts is an adult bookstore, which offers various constitutionally protected adult media items, including "a couple thousand" dvds and magazines and also has private viewing booths. ROA. 10018-10019.

The portrait that Defendants attempt to paint of the New Fine Arts stores as hotbeds of rampant illegality ignores much of the testimony given by Gary Hartstein, the business's Rule 30(b)(6) corporate designee.

 Mr. Hartstein explained that "[w]e're a retail store. Like any convenience store, people are in and out of the store all day long. There's no sex going on in front of anybody." ROA. 10022. And like many retail stores, security cameras, which are monitored by employees, cover the entire interior and exterior of the store, with the exception of inside of the viewing booths to maintain privacy.  ROA. 10020, ROA. 10028. The store also hires security personnel from an outside vendor to patrol the

premises–not because of sex crimes–but to protect store employees and guard against the petty crimes that can happen at any retail store: trespassing and shoplifting. ROA. 10034-10036.

While viewing booths in the store are designed to be private, if there is ever any commotion, disruptive conduct or criminal activity, that is not permitted. ROA. 10047-10048. If commercial sex acts were occurring in the private rooms, obviously Mr. Hartstein would "want to know about it." ROA. 10023. It would make no sense for a business to ignore something like that. Mr. Hartstein explained that if something like that occurred at his business it would give his business a bad name and he would be at risk of losing his business license. ROA. 10023-100024.

When asked at his deposition what he did to prepare to testify on the topic of New Fine Arts' "policies, practices, and procedures regarding employee and/or contractor training related to human trafficking, sex trafficking, prostitution and personal safety" Mr. Hartstein explained that "[a] lot of it doesn't pertain to my store because there's no prostitution. … There's no sex trafficking in our stores." ROA. 10021. Nevertheless, New Fine Arts offers human trafficking training to its managers. ROA. 10021, 10024.

Mr. Hartstein testified that "[i]f there's criminal activity, I would like to know. I want information so we'd stop it." ROA. 10044.

He further testified that store personnel must check customer identification upon entry (e.g., a driver's license, passport, or birth certificate) because "[w]e're not going [to] take their word on it… They can't just say I'm 18, and just for us to take their word on it. They have to show us some proof of … age." ROA.10043.

New Fine Arts' hiring practices are just like any other retail establishment. People respond to internet job postings, hear about openings based on word-of-mouth, apply, and then go through an interview with a manager. ROA. 10033-10034. At any given time, there are between two and five employees in a store. ROA. 10029. During their shifts, the employees do what one would expect: sell the First Amendment protected material, restock the shelves, provide customer service, and keep an eye out for shoplifters. ROA. 10030.

In order to be hired, an employee must present proof of age, e.g., a passport, driver's license, birth certificate, or social security card. ROA. 10037. Additionally, before an employee is hired, New Fine Arts runs a background check, in compliance with a city ordinance licensing and regulating sexually oriented businesses. ROA. 10040. This background check-which requires prospective employees' fingerprints-further verifies age and ensures they have no criminal record. *Id.*

Defendants' claim that New Fine Arts has "taken no steps regarding human trafficking" is simply not true. Appellee Brief at p. 17. New Fine Arts has taken steps

to address crime generally and human trafficking specifically.

Defendants conclude their discussion of New Fine Arts by discussing Ms. Pierce's hearsay statements that in one of her cases, *United States v. Keys*, No. 3:16-cr-00244-N (N.D. Tex), a 15 year old was trafficked in a private viewing room by her pimp at a New Fine Arts store nearly ten years ago. *See* Appellee Brief at p. 17.

In that case, the defendant was convicted at trial of two counts of sex trafficking a child and one count of sex trafficking through force. The defendant appealed and the Fifth Circuit gave a detailed description of the facts of that case. ROA.1601-1621; *United States v. Keys*, 747 Fed. Appx. 198 (5th Cir. 2018). The court explained that the defendant created and posted online advertisements for his victims and then arranged for men to engage in commercial sex acts with them at his apartment and at various hotels. ROA. 1602-1604.

But there was *no* mention of any trafficking at an adult bookstore/arcade in the Fifth Circuit's opinion affirming his convictions. ROA. 1103-1104. Nor was there any mention of trafficking at an adult bookstore/arcade in the indictment. ROA. 1597-1600. And while Ms. Pierce testified that she would expect criminal complaints to include more complete information about the facts of her cases, the 16-page complaint in that case, which extensively documented the defendant posting advertisements for commercial sex acts over the internet and compelling his victims

to engage in sex acts at his residence and various hotels, also did not have any reference to trafficking at an adult bookstore/arcade. ROA. 2325-2340. Thus, nothing in the extensive public record of the case identifies those facts and those allegations were never brought to Mr. Hartstein's attention by law enforcement. ROA. 10046.

Defendants continued attempts to hold New Fine Arts responsible, including its claims that its "deliberate indifference" has yielded sex trafficking are completely unfounded.

Furthermore, it bears repeating that there is nothing in the record to demonstrate that an employee of New Fine Arts, or any other retail adult establishment, has ever been a victim of sex trafficking at any age–in fact, both of the Defendants' witnesses conceded they had no such evidence.

### B.    The Texas Entertainment Association

Defendants then turn to the Texas Entertainment Association ("TEA"). The TEA is a trade association whose essential purpose is to advocate for the collective interests of its members. *See Tex. Ent. Assoc., Inc. v. Hegar*, 10 F. 4th 495, 505 (5th Cir. 2021) ("TEA's purpose is to represent the legal and economic interests of its members.").

Consistent with its purpose, the TEA's basic eligibility requirements are that a member must be in the business of providing adult-oriented expression, desire to

have a say vis-à-vis legislation or litigation that could affect its interests, and is willing to financially contribute to those objectives. ROA. 10062. Those collective interests and objectives are varied. As TEA's designated Rule 30(b)(6) representative, Kevin Richardson explained, at TEA meetings members discuss topics ranging from over-pouring of alcohol to labor laws. ROA. 10056, 10058-59.[1]

Defendants ignore the TEA's purpose and attempt to craft a narrative suggesting that the TEA is somehow deficient because "it does not require its members to follow state and local laws affecting SOBs" or otherwise police its members. Appellee Brief at 18.

However, as is typical of trade associations generally, the TEA is not a regulatory body, a consultancy, or a body responsible for its members' compliance with the web of state and local laws that regulate them. Thus, the TEA does not provide business services to its members, e.g., facilitating its members' licensure, maintenance, or compliance with local ordinances. ROA. 10060-10061. Its purpose is to focus on legislation and litigation affecting the collective interests of its members. ROA 10078.

Nevertheless, the TEA does offer "COAST" (Club Operators Against Sex

---

[1] Mr. Richardson explained that he is affiliated with the TEA because he is a part-owner of several adult nightclubs in the State of Texas that are members of the TEA. ROA. 6122-6123.

Trafficking) training to its members. COAST was co-founded by Plaintiffs' expert witness, Ms. Spencer-Crisp in 2009. She worked with agents from ICE and the Department of Homeland Security to implement and develop the training program to ensure that persons in the adult entertainment industry recognize and report any incidents of human trafficking. ROA 11628-11632.[2] Law enforcement conducts that training in various locations across the county including in the State of Texas. It has provided it to people in every position in the industry, including dancers, management, staff, bartenders, valets, and house moms. ROA.11631. COAST also invites NGOs to present during these trainings on the services that they provide. ROA. 1632. Ms. Spencer-Crisp estimates that over 20,000 people from the adult entertainment industry have been trained through the COAST program. *Id.*

Mr. Richardson was present during Cara Foos Pierce's testimony at the preliminary injunction hearing, where she stated that she had cases where victims had been trafficked at a Buck's Wild nightclubs in Fort Worth and Dallas. ROA.11519. Mr. Richardson is a part-owner of those business and explained that, after the hearing, he investigated her claims. He spoke to his business partner as well as his staff in leadership positions and no one knew anything about it. Law enforcement had

---

[2] As a result of her efforts implementing this training program, Ms. Spencer-Crisp was a nominee for an award by the Director of Homeland Security for meeting the mandates of Congress and the White House in the battle against human trafficking. ROA. 11633.

never made anyone aware of any such allegations. ROA. 10071-10072.

TEA's members have had to terminate droves of 18-20-year-old men and women who worked at their establishments in various roles as a result of S.B. 315. ROA. 11499. Indeed, well over 10,000 employees have been laid off at sexually oriented businesses as a result of S.B. 315. *Id.*

### C.     XTC and Rick's

Plaintiffs Rick's Cabaret and XTC testified through their shared Rule 30(b)(6) representative, Ed Anakar. Mr. Anakar is the Director of Operations for RCI Management Services, Inc., an entity that provides various operational services to subsidiaries of RCI Hospitality Holdings, Inc., a publically traded company on NASDAQ, including Rick's and XTC. Defendants fail to discuss any of Mr. Anakar's testimony that is germane to this case.

Instead, Defendants misrepresent that testimony to attempt to paint Plaintiffs in a negative light. Defendants note that Plaintiffs' parent company announced in December of 2022 that it planned to acquire five adult nightclubs. On the basis of Ms. Pierce's inadmissible hearsay statements about one of those clubs, and more inadmissible hearsay statements contained in media reports about another of those clubs, Defendants claim that sex trafficking had occurred in the past at two of those clubs. Appellee Brief at 18-19. Defendants never explain how or why those past

allegations should taint Plaintiffs or should say anything about how responsibly Plaintiffs will operate the clubs.

Indeed, Mr. Anakar explained that trafficking has not been an issue for his clubs. ROA. 10100. When asked if traffickers might use a strip club as part of their crime, Mr. Anakar testified that "I've never experienced seeing a problem with sex trafficking," further substantiating his assertion by noting that the Clubs are heavily regulated and frequently inspected by law enforcement agents, who regularly enter the clubs, talk to entertainers and other personnel, and check their documentation. ROA. 10107-10108.

Mr. Anakar went on at length about how management must participate in various educational programs covering topics from security, alcohol sales, de-escalation, prostitution and human trafficking awareness programs. ROA. 10112.

Although trafficking has not been an issue for the Clubs, they do require managers to attend COAST training because "[i]t's important information." ROA. 10104. In addition, the company also holds teleconferences once a month with general managers in which trafficking awareness is covered. ROA. 10102. They are trained to look for signs of trafficking. ROA.10085.

Beyond these trainings, the Clubs implement these policies in the real world. For example, prospective dancers must supply government issued ID to verify their

age. ROA. 10088-10091. Management is specifically trained to verify IDs during the application process. *Id.* And dancers' IDs are checked on an ongoing basis. ROA. 10096.

**D.**  **Adult Entertainers Take Their Artistic Performances Seriously, They Come From All Walks Of Life, And Adult Nightclubs Provide Entertainers With Opportunities For Economic Freedom and Stability.**

In addition to testifying about her conclusions concerning the prevalence of trafficking at adult nightclubs in Texas,[3] Plaintiff's expert, Ms. Spencer-Crisp, also testified at trial about her first hand experience as a performer at adult night clubs and as someone who has worked in the adult entertainment industry, in numerous capacities, for over thirty years.

She explained that performers are professional entertainers, who take their performances, costumes and artistry seriously. ROA.11634-11635. Performing at an adult nightclub is also attractive because it allows for greater earning potential and freedom from minimum wage. *Id*.

Ms. Spencer-Crisp testified that these performers come from all walks of life. Indeed, some attend college or serve in the military, others have successful careers in real estate or other professions. Ms. Spencer-Crisp recounted one former dancer

---

[3] While the district court did not accept Ms. Spencer-Crisp's expert conclusions as to the prevalence of trafficking, it did not criticize any other aspect of her testimony.

she knew who went on to become an anesthesiologist. *Id.*

In its findings of fact and conclusions of law, the district court also recounted the testimony of Evanny Salazar at the preliminary injunction hearing in this matter. ROA. 11400. The district court noted that prior to the passage of S.B. 315, Ms. Salazar worked at two adult cabarets in San Antonio, Texas, where she earned about $1,000 a night, which allowed her to obtain housing and cover her living expenses. *Id*. As a result of S.B. 315's age restriction, Salazar lost her job and had to change to a lower paying job and could no longer afford her housing. *Id*.

Sophie Osteen, an adult performer, who testified in opposition to S.B. 315 in front of the Texas Senate Committee on Jurisprudence,[4] shared her own story about being a young-adult entertainer in Texas. She testified that she believed working as an exotic dancer was safe, empowering and necessary for her to help pay her tuition. ROA. 9991. She graduated high school early at the age of 16 with straight A's, and immediately enrolled in college, where she studies nursing. After turning 18, she began performing as an exotic dancer in the Houston area, which helps pay for her education. *Id.* She testified, "I love school and I can only go to school because of what I do, because that is what pays for it." *Id.* As an exotic dancer at three different adult nightclubs, she has "never felt unsafe," has "never been forced to do anything

---

[4] https://tlcsenate.granicus.com/MediaPlayer.php?view_id=49&clip_id=15817 (last visited December 17, 2024) at 1:13:01-1:16:03.

I am uncomfortable with, ever." *Id.* Ms. Osteen stated that she was sexually assaulted as a minor and her employment as an erotic dancer has helped her to "take back that power" that she thought she lost when she was assaulted. *Id.*

## II. S.B. 315 CANNOT SURVIVE INTERMEDIATE SCRUTINY

This Court recently emphasized that intermediate scrutiny is not a toothless standard. *Hines v. Pardue,* 117 F.4th 769, 779 (5th Cir. 2024). "While not as exacting as strict scrutiny, intermediate scrutiny is no gimmee for the government: '[I]ntermediate scrutiny is still tough scrutiny, not a judicial rubber stamp.'" *Id.* quoting *Cablevision Sys. Corp. v. F.C.C.,* 597 F. 3d 1306, 1323 (D. C. Cir. 2010) (Kavanaugh, J., dissenting).

The district court applied intermediate scrutiny to S.B. 315. More specifically, it applied the four-part test from *United States v. O'Brien*, 391 U.S. 367, 377 (1968). The Supreme has found that this test and the test from *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), applicable to secondary effects cases, "embody much the same standards." *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991); *see also Turner Broad Sys., v. FCC*, 512 U.S. 622, 662 (1994); *Accord Doe I v. Landry*, 909 F.3d 99, 111 (2018). It is Defendants who bear the burden of proving S.B. 315 is constitutional under this standard. *See Siders v. City of Brandon*, --- F.4th ----, 2024 WL 5065550 at *5 (5th Cir. Dec. 11, 2024).

**A.    The *Renton* Formulation Requires That a Secondary Effects Regulation Target Only The Sources Shown To Produce The Claimed Adverse Secondary Effects**.

In *Renton,* the Supreme Court emphasized, in support of its decision to uphold a zoning ordinance aimed at secondary effects, that the regulation was "'narrowly tailored' to affect only that category of [businesses] shown to produce the unwanted secondary effects..." *Renton*, 475 U.S. at 42 (citations omitted).

In *Association of Club Executives v. City of Dallas*, 83 F.4th 958 (5th Cir. 2023), this Court vacated a district court's order granting a preliminary injunction of an ordinance, which prohibited sexually oriented businesses from operating between 2 a.m. and 6 a.m. It cited *Renton* for the proposition that an ordinance aimed at claimed secondary effects must be "designed to serve a substantial governmental interest and allow[] for reasonable alternative avenues of communication." *Id*. at 965. In a footnote to that same passage, this Court stated as follows:

> We have sometimes observed that restrictions on SOBs must be narrowly tailored. *See Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 292 (5th Cir. 2003) *as clarified*, 352 F. 3d 938 (5th Cir. 2003). But later precedents have explained that a restriction that satisfies *Renton*'s formulation is necessarily narrowly tailored. *See H and A Land Corp. v. City of Kennedale*, 480 F.3d 336, 339 (5th Cir. 2007).

*Id*. at n 8.

Defendants take this footnote to mean that narrow tailoring is no longer

15

required of a *Renton* ordinance. Appellee Brief at p. 46. But that is not what that footnote means.

If a *Renton* regulation furthers the government's interest in reducing secondary effects by affecting "only that category of [businesses] shown to produce the unwanted secondary effects" then, by definition, it is necessarily narrowly tailored. This Court's decision in *H and A Land Corp. v. City of Kennedale*, 480 F.3d 336, 339 (5th Cir. 2007), the case which *Club Executives* cites in support of footnote 8 of its opinion, proves that point.

In *H and A Land Corp.*, the plaintiff was an adult bookstore that sold sexually oriented expression solely for off-site consumption. This Court explained that, "Time place, and manner restrictions on speech violate the First Amendment unless they are content-neutral, are designed to serve a substantial governmental interest, do not unreasonably limit alternative avenues of communication, and are narrowly tailored." *Id.* at 338 *citing Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 291-92 (5th Cir. 2003). It further explained "Kennedale's ordinances meet the narrow tailoring standard if they 'target and eliminate no more that the exact source of the evil they seek to remedy.'" *Id*. (citations and internal punctuation marks omitted). "Thus, an ordinance meant to deter property depreciation may only regulate businesses for which a connection to property depreciation can be demonstrated." *Id.*

This Court then concluded that:

...a city that enforces an ordinance meant to prevent harmful secondary effects associated with the operation of an off-site business must rely on evidence showing that off-site businesses, rather than pointing to the broader category of sexually oriented businesses that include on-site businesses, cause secondary effects.

*Id.* at 339.

Thus, to determine whether the ordinance was narrowly tailored this Court had to determine whether the City "could reasonably believe" that the evidence at issue was relevant "to show the requisite connection to harmful secondary effects." *Id. citing City of Los Angeles v. Alameda Books*, 535 U.S. 425, 438 (2000). "In other words, we ask whether the evidence 'fairly support[s] the [city's] rationale for its ordinance." *Id. quoting Alameda Books*, 535 U.S. at 438. It then noted that, "Kennedale cannot reasonably believe its evidence is relevant" unless it sufficiently segregated the data attributable to off-site establishments from the data attributable to on-site establishments. *Id*. The Court ultimately concluded that City satisfied that test. *Id.* at 341.

*Club Executives* itself makes the same point in another footnote, which stated, in relevant part:

Plaintiffs suggest that, at a minimum, the City does not carry its burden with respect to adult bookstores, for which the district court found the "data [was] weakest." But while *Plaintiffs can continue to press this*

17

*argument before the district court*, we do not think a preliminary injunction is warranted as to adult bookstores.***

*Club Executives*, 83 F.4th at 969, n. 13. (emphasis added).

In other words, to uphold the ordinance requiring adult bookstores to close between 2 a.m. and 6 a.m., upon final hearing, the City must segregate the data attributable to adult bookstores and demonstrate it supports its rationale.

### B.    The District Court's Findings Of Fact

Again, the district court found, as a factual matter, that "S.B. 315 plainly regulates more than necessary to stop sex trafficking, as it prohibits all employment of 18-to-20-year-olds at SOBs. This ban applies regardless of whether those employment positions are considered vulnerable to trafficking." ROA.11406.  And it found that employees who work at sexually oriented businesses in positions other than dancers, "are not likely to be trafficked..." ROA. 11407. Thus, "S.B. 315 regulates broad swaths of employment at SOBs, regardless of whether they are tied to sex trafficking." ROA. 11409.

"None of that matters" according to Defendants. Appellee Brief at 28.  But, of course it matters. Indeed, the stated purpose of S.B. 315 was to reduce sex trafficking by banning adults between the ages of 18-20 from working at sexually oriented businesses. Thus, it is *that* interest which must be furthered by the

regulation. The entire case in the district court was premised on that basic proposition.

Now, on appeal, no doubt in recognition that they cannot overcome the district court's factual findings, Defendants attempt to conjure up other reasons, never advanced in the district court, for why banning all 18-20 year old adults from working at sexually oriented businesses could be justified.[5] According to Defendants, these adults, who are deemed fit serve in the military and vote, exercise such poor judgment that they must be banned from working at these businesses because they could become victims, or even participants in, various other crimes. For example, they argue that young adults could be exposed to underage drinking by working at sexually oriented businesses.[6] Appellee Brief at p. 48. Aside from the fact that adult bookstores/arcades do not serve alcohol, all of these new arguments are untethered to the State's justification for S.B. 315. Furthermore, Defendants own expert witness, Dr. Bouche, testified at trial that if S.B. 315 only regulated entertainers at adult nightclubs, the State's interest in justifying S.B. would be achieved. ROA. 11811.

---

[5] These arguments lack merit but they also cannot be raised for the first time on appeal. *Greenberg v. Crossroads Sys., Inc.*, 364 F. 3d 657, 669 (5th Cir. 2004).

[6] Yet 18-20 year-olds may lawfully patronize sexually oriented businesses. And 18-20 year olds can work in any bar, tavern, or alcohol serving nightclub that does not present adult entertainment.

Ultimately, the district court concluded that its factual findings were not fatal to the law's constitutionality because "[w]hile S.B. 315 may burden employees who are not especially vulnerable to trafficking, those employees' positions also lack First Amendment coverage." ROA.11407.

Thus, whether the district court erred in this legal conclusion (which is reviewed by this Court *de novo*), is the primary question in this appeal.

### C. As Applied To Adult Bookstores/Arcades And To Adult Nightclub Personnel Other Than Entertainers, S.B. 315 Is Unconstitutional.

#### 1. Employees At Adult Bookstores/Arcades

In their opening brief, Appellants demonstrated that employees at adult bookstores, adult video stores, and adult arcades directly disseminate constitutionally protected expression. Amada Man, who worked as a clerk at Plaintiff New Fine Arts, testified at the preliminary injunction hearing that, in her employment capacity, she sells adult magazines, like Playboy, and sexually oriented movies and promotes various products and media to customers. ROA.11476-11477.

Defendants argue that because these expressive activities are part of her job responsibilities, Ms. Man is engaging in her employer's speech rather than her own. Appellee Brief at 43, *citing Bevil v. Fletcher*, 26 F.4th 270, 278 (5th Cir. 2022).[7]

---

[7] *Bevil* was a First Amendment retaliatiatory discharge action. The issue before the court was whether the plaintiff, a police officer, was speaking as a private citizen on a matter of public concern or as a public employee pursuant to his official job

The notion that an employee is not engaging in expressive activity, covered by the First Amendment, because her speech is a part of her job duties simply does not make sense. Is an employee who solicits charitable contributions on behalf of her non-profit organization not engaging in First Amendment activity because that is what she was hired to do? Is a news anchor who reads copy prepared by the producer of the broadcast not engaging in First Amendment activity because her speech was written by someone else? Of course these employees are engaged in expressive activity covered by the First Amendment.

Defendants fail to explain how employees, like Ms. Man, who market, promote, recommend and sell constitutionally protected literature and videos are not engaged in expressive activity covered by the First Amendment. Indeed, the Supreme Court has long held that a bookseller, who sells speech created by others, is engaged in expressive activity protected by the First Amendment. *See, e.g. Smith v. California*, 361 U.S. 147, 150 (1959); *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982). Similarly, there is no question that a publisher, who is in the businesses of publishing speech created by others, is engaged in expressive activity protected by the First Amendment.

---

duties. *Id*. at 276 *citing Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). But that case had nothing to do with whether the plaintiff, who was allegedly retaliated against for writing an affidavit on behalf of a criminal defendant, was engaged in *expressive activity* in the first place.

*See, e.g., Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 116 (1991); *New York Times v. Sullivan*, 376 U.S. 254, 286–88 (1964); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 65, n. 6 (1963).

Thus, the district court's legal conclusion that these employees "have no expressive speech tied to their employment" was erroneous. ROA. 11407.

2.      Non-Performing Adult Nightclub Employees.

Defendants offer no rebuttal to Plaintiffs' arguments that non-performing employees at adult nightclubs are all necessary to ensure that an adult nightclub presents performances to its audience.

Their argument that a regulation that burdens those positions can, on a proper showing, be upheld under the secondary effects doctrine does not respond to the current issue–whether the district court erred in concluding that these positions are not covered by the First Amendment in the first place. Moreover, in making this argument, Defendants implicitly concede that non-performing employees at sexually oriented businesses *are* engaged in expressive activity. Appellee Brief at 45 (stating "in the secondary effects context, the State *can* place some burdens on the speech-creation process, so long as it leaves open reasonable alternative avenues of communication) (emphasis in original).

3.  Under *Illusions-Dallas Private Club v. Steen*, 482 F.3d 299 (5th Cir. 2007), S.B. 315's Total Ban Of 18-20 Year-Old Non-Performing Employees Working at Sexually Oriented Businesses Must Further the State's Interest in a Narrowly Tailored Way.

In *Illusions*, this Court considered a statute that prevented sexually oriented businesses located in certain dry political subdivisions, from obtaining or renewing private club permits to serve alcohol. Although the underlying conduct at issue (the sale and consumption of alcohol) by itself was not protected by the First Amendment, this Court held that the statute needed to pass intermediate scrutiny under the First Amendment because sexually oriented businesses were burdened by the law precisely because of the content of the expression they disseminated. *Id*. at 307. Thus, the prohibition on the sale of alcohol in that case had to be shown to further the state's interest in reducing secondary effects. *Id.* at 312. *See also Hines, supra*, 117 F.4th at 778 (holding that in determining whether First Amendment scrutiny applies to a regulation the question is whether "the communication of a message" triggers coverage).

Here, Plaintiffs are denied the ability to have 18-20 year old adults serve in non-performing capacities at their establishments precisely because they are sexually oriented businesses. Therefore, S.B. 315 must pass intermediate scrutiny and *that* burden imposed on sexually oriented businesses must further a substantial

governmental interest, regardless of the roles served by non-performing employees.

In their responsive brief, Defendants have this to say about *Illusions*: "Plaintiffs' discussion of *Illusions* [], adds nothing to their argument. They cite passages in that opinion for the simple proposition that the First Amendment applies to this case in the first instance, a separate inquiry from whether S.B. 315 passes the *Renton* test. *See Illusions* 482 F.3d at 307." Appellee Brief at 47. Defendants miss the point of *Illusions* and Plaintiffs' argument.

When a law's burden is triggered by the content of expression a business disseminates, that burden must further a substantial government interest, regardless of whether the underlying conduct being regulated (in *Illusions* the selling and consuming of alcohol) is itself an expressive activity. The inescapable conclusion when applying *Illusions* to this case is that S.B. 315's prohibition on Plaintiffs hiring all 18-20 year olds, in any capacity, must actually further the State's interest in reducing trafficking.

**D.  Even As Applied to the Prohibition On Sexually Oriented Businesses Hiring 18-20 Year Olds As Dancers, S.B. 315 Is Unconstitutional.**

The Supreme Court has held that "nonobscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment." *U. S. v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994). *A fortiorari*, erotic dancing by

performers over the age of 17 is protected by the First Amendment.

The fact remains that Defendants have not offered anything to dispute the fact that the vast majority of adult entertainers ages 18-20, or above for that matter, are not victims of or at risk of becoming victims of trafficking.

Defendants insist that because some small percentage of 18-20 year old adults have or may become victims, the government may step in and prohibit an entire segment of the adult population from exercising their First Amendment rights to perform in adult nightclubs, without showing that any less intrusive measure than an outright ban would be ineffective. This court's recent decision in *Hines v. Pardue*, *supra*, 117 F.4th 769, demonstrates why that is insufficient.

In *Hines,* a disabled veterinarian, who provided veterinary advice over his computer, challenged a Texas regulation that required a physical examination for practicing veterinary medicine as unconstitutional under the First Amendment as applied to him. *Id.* at 770. This Court, applying intermediate scrutiny, which it emphasized was "tough scrutiny," held the law unconstitutional. *Id.* at 779.

Notably, the plaintiff proposed a number of less restrictive alternatives than the physical examination requirement. Under *McCullen v. Coakley*, 73 U.S. 464 (2014), the burden rests with the State to prove that "it seriously undertook to address the problem with less intrusive tools readily available to it." *Id.* at 784. The State failed

to show that it addressed the problem with those less intrusive measures or explain why those alternatives would not be effective. *Id.*

This Court concluded its opinion by noting that the physical examination requirement may be an efficient and effective way to protect animal welfare. However, "where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrificing speech for efficiency.'" *Id. quoting McCullen,* 73 U.S. at 493-94.

Here, Plaintiffs also presented numerous less speech restrictive alternatives other than a total ban on all 18-20 year old adults performing in sexually oriented businesses, including mandatory human trafficking training requirements for employees of sexually oriented businesses, posting of human trafficking awareness signs at sexually oriented businesses, and requiring employee identification and background checks.

Defendants have not taken any effort to employ these less intrusive alternatives or explain why they would not be effective, which should be fatal to the law's constitutionality. *See McCullen,* 73 U.S. at 493-94; *Hines,* 117 F. 4th at 785. *See also Landry*, 909 F.3d 111 at n.2, citing 1 *Smolla & Nimmer on Freedom of Speech* §9:17 (2018) ("When the government could adopt a narrower regulation that would

significantly reduce the negative impact on speech without substantially interfering with its legislative goals, the government should be forced to adopt the narrower regulation").

### III. S.B. 315 IS UNCONSTITUTIONALLY OVERBROAD UNDER THE FIRST AMENDMENT.

In their response to Plaintiffs' argument that S.B. 315 is unconstitutionally overbroad, Defendants recycle the same arguments they made earlier in their brief. Appellee Brief at p. 50.

But those arguments do nothing to refute the record in this case as well as the case law cited by Plaintiff, demonstrating that employees of adult bookstores/arcades and non-performing employees are protected by the First Amendment and that S.B. 315 burdens Plaintiffs' First Amendment rights by prohibiting them from hiring 18-20 year olds in any capacity, even though there is no evidence that non-performing employees of sexually oriented businesses have ever been victims of trafficking.

As the district court found "S.B. 315 plainly regulates more than necessary to stop sex trafficking" ROA. 11406.

### CONCLUSION

For all of the foregoing reasons, as well as those set forth in Plaintiffs-Appellants' opening brief, the judgment of the district court should be reversed and

judgment should be rendered in favor of Plaintiffs-Appellants, or the case should be remanded to the district court with instructions to enter judgment declaring S.B. 315 unconstitutional under the First and Fourteenth Amendments and permanently enjoining its enforcement.

Respectfully submitted,


/s/ J. Michael Murray
J. MICHAEL MURRAY
(Ohio Bar No. 0019626)
jmmurray@bgmdlaw.com
WILLIAM C. LIVINGSTON
(Ohio Bar No. 0089538)
BERKMAN, GORDON, MURRAY & DeVAN
55 Public Square, Suite 2200
Cleveland, Ohio 44113-1949
(216) 781-5245 / (216) 781-8207 (Facsimile)

CASEY T. WALLACE
(Texas 00795827)
cwallace@wallaceallen.com
WALLACE & ALLEN, LLP
440 Louisiana Suite 590
Houston, Texas 77002
Tel. (713) 227-1744 / Fax: (713) 600-0034

Attorneys for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

A copy of the foregoing Reply Brief of Appellants was filed electronically with the Clerk of Courts on December 24, 2024. By using the appellate cm/ecf system, notice of the filing was sent to and service of it was perfected on the parties who are all registered users.

/s/ J. Michael Murray
J. MICHAEL MURRAY
(Ohio Bar No. 0019626)
jmmurray@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DeVAN

Attorney for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,139 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been pre-pared in a proportionally spaced typeface (14-point Equity) using Word Perfect (the same program used to calculate the word count).

/s/ J. Michael Murray
J. MICHAEL MURRAY
(Ohio Bar No. 0019626)
BERKMAN, GORDON, MURRAY & DEVAN

Attorney for Plaintiffs-Appellants